COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT DEPT.
CIVIL ACTION NO. 227: CV00995A

|  |  |
|---|---|
| ABIOMED, INC. and ABIOMED EUROPE GmbH, Plaintiffs, | ) ) ) ) |
| v. | ) ) |
| ENMODES GmbH. and TIM KAUFMANN, Defendants. | ) ) ) ) |

**PUBLIC VERSION - REDACTED**

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiffs ABIOMED, INC. and ABIOMED EUROPE GmbH, by and through their

attorneys, upon knowledge as to themselves and their own acts, and upon information and belief

as to all other matters, hereby bring this Complaint against Defendants ENMODES GmbH and

TIM KAUFMANN, pleading as follows:

### I.    INTRODUCTION

1.    This case is about breach of contract and the misappropriation of valuable trade

secrets and confidential business information.

2.    Plaintiffs Abiomed, Inc. and Abiomed Europe GmbH (collectively, "Abiomed")

are world leaders in the field of catheter-based heart pumps and other cardiac-related medical

devices. Abiomed has spent hundreds of millions of dollars developing market-leading products,

including the Impella line of minimally invasive intravascular heart pumps.

3.    Abiomed entered into consulting agreements with Defendant enmodes GmbH

("Enmodes"), a small German engineering firm whose co-founder and managing director is

Defendant Dr. Tim Kaufmann ("Kaufmann"). Under these agreements, Enmodes was to provide

services to assist the development of particular aspects of Abiomed's revolutionary next-generation compressible heart pump, the Impella ECP.

4.     Abiomed shared its valuable proprietary information and trade secrets with Enmodes in reliance on Enmodes's contractual commitments to keep confidential Abiomed's information and any discoveries Enmodes made during the project, to refrain from providing services to Abiomed's competitors, and to acknowledge Abiomed's ownership of intellectual property, including the confidential information and trade secrets Abiomed provided to Enmodes and any intellectual property created or discovered by Enmodes during its work for Abiomed.

5.     Enmodes and Kaufmann did none of these things.  Instead, while assuring Abiomed that they were complying with their obligations, they wrongfully and in secret disclosed Abiomed's confidential information and trade secrets to a Chinese company co-founded by Kaufmann.  That Chinese company, which openly touts itself as Abiomed's competitor, has improperly used Abiomed's information to file Chinese patent application and has falsely attempted to claim Abiomed's innovations as its own.

6.     Through this complaint Abiomed seeks redress for the wrongs committed by Enmodes and Kaufmann.

## II.    PARTIES

7.     Plaintiff Abiomed, Inc. is a corporation organized under the laws of Delaware with its usual place of business at 22 Cherry Hill Dr., Danvers, MA 01923.

8.     Plaintiff Abiomed Europe GmbH ("Abiomed Europe") is a limited liability company organized under the laws of Germany with its usual place of business at Neuenhofer Weg 3, 52074 Aachen, Germany.

9.     Defendant Enmodes is a limited liability company organized under the laws of Germany with its usual place of business at Wilhelmstrasse 38, 52070 Aachen, Germany.

10. Defendant Tim Kaufmann is an individual residing in Aachen, Germany. Kaufmann is a co-founder and Managing Director of Enmodes.

### III.   JURISDICTION AND VENUE

11. This court has personal jurisdiction over Defendants pursuant to G.L. c. 22 A, § 3.

12. *First*, and as described further below, Defendants have transacted business n Massachusetts pursuant to G.L. c. 223A, § 3(a) at least by entering into a contract with A omed, Inc. and by negotiating other contracts with Abiomed employees in the Commonwealth. Specifically, Defendants entered into a Statement of Work with Abiomed, Inc. and have e gaged in negotiations by email, telephone and videoconference with Abiomed employees workir ; at Abiomed, Inc.'s Danvers headquarters.

13. *Second*, and as described further below, Defendants have transacted busine s in Massachusetts pursuant to G.L. c. 223A, § 3(a) at least by performing consulting services or and on behalf of Abiomed, Inc., and by engaging in collaborative research and development e orts with Abiomed employees working in Massachusetts. Over the course of Abiomed's partn rship with Defendants, Defendants regularly contacted Abiomed employees working in Massac usetts in order to communicate the progress and results of ongoing research and development ef rts that Defendants were conducting for Abiomed. Defendants also received confidential information and trade secrets from Massachusetts, including confidential information and rade secrets stored on servers physically located in Massachusetts.

14. *Third*, and as described further below, under their contracts with Abiomed, Defendants have contracted to supply consulting services in Massachusetts pursuant to G.L. c. 223A, § 3(b). Specifically, pursuant to a Consulting Services Agreement and the

accompanying Statement of Work, Defendants agreed to provide consulting services to Abiomed in exchange for valuable consideration.

15.     *Fourth*, and as described further below, at least by misappropriating Abiomed confidential information and trade secrets while deriving substantial revenue from services rendered to Abiomed in Massachusetts, Defendants have caused tortious injury to Abiomed in Massachusetts pursuant to G.L. c. 223A, § 3(d).

16.     Venue is proper in Essex County pursuant to G.L. c. 223, § 1 because Abiomed, Inc. has its usual place of business in Danvers.

## IV.     STATEMENT OF FACTS

### A.     Abiomed Is a World Leader in Heart Pump Technology

17.     Abiomed develops and sells groundbreaking medical devices for cardiac and respiratory support.  Abiomed's products are used around the world by interventional cardiologists and cardiac surgeons on patients before, during or after angioplasty, heart surgery and other procedures.  Because of Abiomed's products and innovations, the lives of thousands of patients are saved or improved each year.

18.     Abiomed's core product line is its heart pumps, which it markets under the name Impella®.  Impella heart pumps augment the pumping function of the heart to improve blood flow and circulation.  Abiomed is a market leader in the field of intracardiac blood pumps, including for left and right ventricular support.

19.     Impella heart pumps achieve the difficult technological feat of being sufficiently powerful to drive significant blood flow while having a very small motor and associated components.  Current Impella pump models are 12 to 21 French (4 to 7 millimeters (mm)) in diameter, which usually allows them to be inserted and moved through the patient's blood vessels to the heart using a catheter.

20.     For example, the Impella CP®, a percutaneous heart pump with an integrated onboard motor and sensors, can be quickly inserted into the femoral artery and moved through the arterial system to reach the left ventricle of the heart.  Once in position, the Impella CP pumps blood out of the ventricle and delivers it to the circulatory system.  Despite being only 4.7 mm in diameter, the Impella CP can safely pump up to 4.1 liters of blood per minute, which reduces ventricular stress and maintains circulation, including blood flow to vital organs.

21.     By contrast, many other heart pumps have to be surgically implanted by opening the patient's chest.  Because such a procedure is much more stressful for the patient, it often cannot be used or leads to longer hospital stays, especially for elderly or sick patients.  The removal of a surgically implanted heart pump requires the patient's chest to be opened again, so surgically implanted heart pumps are frequently not suitable for short-term use.

22.     For these reasons, minimally invasive insertion of the heart pump by means of a catheter instead of a surgical insertion is of great medical benefit.  Abiomed's Impella pumps are the only active blood pump technology (*i.e.*, a blood pump using a rotating pumping element) available on the market in Europe or the U.S. that can be inserted into the patient using a catheter.

**B.     Abiomed Conducts Extensive Research and Development**

23.     Abiomed has been conducting research and development in the field of insertable active blood pumps since its founding in 1981.  Abiomed currently spends over $120 million a year on research and development of heart pumps and other cardiopulmonary devices.  Because of the technical and physiological challenges in developing complex medical devices such as the Impella, Abiomed's extensive research and development activities and results are a key reason for its ongoing business and technological success.

24.     Abiomed conducts many of its research and development activities in Danvers, Massachusetts.  It also manufactures or assembles its products in Danvers, and it markets and distributes them out of its Danvers office.

25.     Most Abiomed projects are developed in the United States.  Abiomed research and development employees in the United States collaborate with Abiomed research and development engineers in Europe to complete these projects.

**C.      Abiomed Creates, Maintains and Utilizes Valuable Confidential Information**

26.     Because a heart pump must be safely inserted into, operated in and removed from the beating heart of a living human being, its technical design details are of utmost importance. Even small differences in the design of heart pumps may have considerable repercussions, including potentially threatening patient safety.

27.     For example, in order to achieve high pumping performance with the smallest possible insertion diameter, the pump's rotor must rotate at extremely high speeds, which has the potential to damage blood cells as they pass by the rotor.  The Impella avoids causing such damage, but even tiny changes in geometry or small deviations from intended design can greatly affect the interaction of the blood pump with the blood and can lead to physiological harm.

28.     Accordingly, ongoing and comprehensive research and development work and testing is extremely important in this field.  Abiomed has amassed decades' worth of unique and valuable know-how and other information.  This extensive know-how reflects numerous details of the technical design of the heart pumps, their interaction and effects in the human organism, and in their minimally invasive placement by means of catheters.

29.     Abiomed's technical know-how is not limited to pump design.  The manufacture and assembly of its devices require specialized knowledge.  Abiomed's production employees

must first complete several months of training before they can be involved in the production of this extremely sensitive technology.

30.     Much of Abiomed's technical information is not generally known or readily accessible to persons in the field who usually handle this type of information.  This information therefore provides Abiomed advantages over competitors who lack this knowledge.  Keeping Abiomed's technical knowledge confidential has considerable economic value, as it allows Abiomed to develop new technologies, draft patent applications, and manufacture products that can compete more effectively in the marketplace.

31.     If Abiomed's competitors were able to improperly access Abiomed's confidential and proprietary information, they could unfairly receive the benefit of Abiomed's extensive investments in research and development.  This would allow them to develop and sell competing products at a lower cost because they would get the benefit of Abiomed's innovations without spending the hundreds of millions of dollars that Abiomed invested in creating those innovations and developing its products.  Abiomed's competitors could also potentially use Abiomed's information to develop and get products to the market sooner than they otherwise could have, including potentially getting products to market ahead of Abiomed.

32.     Even when Abiomed decides to seek patent protection for its innovations, it maintains secrecy for those innovations unless and until it files patent applications on them.  The premature release of information could potentially lead not only to the consequences referenced earlier, but also threaten Abiomed's ability to obtain patent protection on its innovations.

**D.     Abiomed Takes Extensive Precautions To Safeguard the Confidentiality of Information about Its Valuable Technological Innovations**

33.     Keeping Abiomed technical information confidential is so important to preserving and strengthening Abiomed's competitive position that Abiomed takes extensive measures to

safeguard the confidentiality of such information. Abiomed executes strict confidentiality agreements with employees and third parties before disclosing confidential information to them, classifies and segregates sensitive data, mandates proper handling of confidential information through a Code of Conduct, trains its employees to maintain confidentiality, and implements strict IT security precautions.

34. Abiomed's standard employment contract contains an explicit obligation to keep Abiomed information confidential. Abiomed employees are trained on their obligations to protect proprietary and confidential information within their personal knowledge, preserved in written media (both hard copy and electronic) and contained in electronic media and networks. Abiomed also provides its personnel with an employee handbook that provides additional detail on their confidentiality obligations.

35. When Abiomed works with a third party in areas such as research or development, it executes confidentiality agreements whenever Abiomed's confidential information may potentially be shared or exchanged and before any such information is made available to the third party.

36. Abiomed educates its employees on the wide range of material that may constitute confidential information, and requires them to take proper steps to protect that information from disclosure or use by unauthorized persons.

37. Abiomed also takes extensive IT security measures to ensure confidentiality. For example, access to Abiomed systems (local and remote) is password-protected with appropriate security requirements, including two-factor authentication in some cases. Data is encrypted where appropriate, such as when transmitted over public networks (including Internet or VPN/remote access) or on mobile computing devices.

38.    Users require documented authorization from management to access Abiomed's

systems. For this purpose, the relevant manager must complete a form allowing access to

systems and applications before IT rights are assigned.  Access to Abiomed's on-site data centers

is also restricted and monitored.  In addition, Abiomed undertakes extensive system monitoring,

and its own internal IT security teams work closely with industry-leading security providers.

**E.**     **Abiomed Is Developing the Impella ECP, a Next-Generation Heart Pump with a Smaller Insertion Diameter**

39.    Abiomed is currently engaged in research and development of the next generation

of Impella heart pumps, the Impella ECP™.  The goal is for Impella ECP to have an even smaller

insertion and removal diameter, as well as a more flexible design.  These features will lead to

numerous medical advantages during patient treatment.

40.    The Impella ECP pump will be only 9 French (3 mm) wide during insertion and

removal, making it the smallest heart pump in the world and the first to be compatible with small

bore access and closure techniques.  Despite this extremely small insertion size—3 mm is about

twice the diameter of a pinhead—the Impella ECP will provide blood flow of greater than 3.5

liters per minute.

41.    The Impella ECP achieves such an impressive combination of size and pumping

power by compressing the pump components during insertion into the patient.  When the pump

is in position in the heart, its components expand to provide greater pumping performance.

Before the pump is removed, its components are compressed again.  The compression before

insertion and before removal, can significantly reduce the diameter of the puncture at the entry

site through the skin and into an artery, as well as the associated risk of complications.

42.    Abiomed has invested more than 14 years of development work designing the

Impella ECP.  In addition, Impella ECP development utilizes and builds on Abiomed's extensive

experience with predecessor systems, as well as from knowledge Abiomed gained from the hundreds of thousands of times those predecessor systems have been used in humans. Abiomed's experience with these predecessor systems derives from substantial work of its Danvers-based research and development employees.  The use of such information has significantly accelerated the development time of the Impella ECP.

43.     Abiomed's platform lead for the Impella ECP is located in Massachusetts, along with a team of engineers.  The Danvers-based ECP platform lead is aware of the progress of all aspects of the Impella ECP project.

44.     The Impella ECP team in Massachusetts oversees research and development that is conducted in Germany.  This oversight is accomplished through, for example, daily meetings between the Massachusetts-based team and additional engineers located in Berlin.

45.     In August 2021, the Impella ECP received Breakthrough Device designation by the Food and Drug Administration pursuant to the Breakthrough Device Program, which is intended to help patients receive more timely access to certain medical technologies by providing a speedier development, assessment and review process for such technologies.

46.     The Impella ECP device is still in development and has not yet been approved for commercial use or sale.  Abiomed currently plans to market the device throughout the United States and overseas.

47.     In an early visibility study, Abiomed has supported over 40 patients using its Impella ECP device.  Further, Abiomed has begun enrollment under a pivotal-like protocol.  All patients who have been supported using the Impella ECP device are located in the United States.

**F.     Abiomed Enters into Agreements with Enmodes**

48.     Enmodes was founded in 2011 by persons associated with RWTH Aachen University in Aachen, Germany, including Tim Kaufmann and Ulrich Steinseifer, who were two

initial shareholders.  Kaufmann, who had a majority share, acted as co-managing director of Enmodes.

49.     Enmodes provides design and engineering services in the medical device field with a focus on computation analyses and numerical simulations, as well as their optimization and validation.

50.     In an effort to move beyond its core simulation business, Enmodes began working on a project to build an extra corporeal membrane oxygenation ("ECMO") device.  An ECMO device assists patients who cannot perform adequate oxygen-carbon dioxide gas exchange by ordinary breathing.  When connected to an ECMO, the patient's blood flows out of the body, into an artificial lung that performs gas exchange, and then is pumped back into the body.

51.     Enmodes was seeking to build an ECMO device to treat patients with early stage chronic obstructive pulmonary disorder (COPD).  At the heart of Enmodes's project was a technology known as "RasQ", a respiratory assist technology that would mimic the elasticity (or "compliance") of the lungs.

52.     At the same time, Abiomed, Inc. and Abiomed Europe's Chief Technology Officer, Thorsten Siess, was interested in developing a device to help treat patients experiencing more critical respiratory failures.  ECMO technology would be an essential component of his device.

53.     Enmodes CEO Kaufmann approached Abiomed's Siess and asked whether Abiomed would be interested in adapting the Enmodes ECMO technology to design its lung device.  Abiomed's Siess believed that partnering with Enmodes—and using Enmodes's RasQ ECMO technology—could help accelerate both companies' research and development objectives.

1. 

54.  Before signing any development or consulting agreements with Enmodes, Abiomed took precautions to safeguard the confidentiality and ownership of its information and intellectual property.

55.

56.

57.

2.

58.



59. ██████████████████████████

60. ██████████████████████████

61.   ██████████   was negotiated in the fall of 2017 by Steve McEvoy and Thorsten Siess on behalf of Abiomed, and Kaufmann on behalf of Enmodes.  Negotiations occurred via email and telephone calls between the parties.  Mr. McEvoy was then Vice President and General Counsel at Abiomed, Inc. and was based at Abiomed, Inc.'s corporate headquarters in Danvers, Massachusetts, from where he conducted the negotiations, sent and received emails, and had telephone conversations with Enmodes's representatives.

62. ██████████████████████████

63.     ████████████████ was negotiated by Marc Began and Thorsten Siess on behalf of Abiomed, and Kaufmann and Sascha Kuns (Deputy CEO and CFO) on behalf of Enmodes. Mr. Began was then Abiomed, Inc.'s Vice President, General Counsel and Secretary. He was based at Abiomed, Inc.'s corporate headquarters in Danvers, Massachusetts, from where he conducted the negotiations, by email and telephone conversations with Enmodes's representatives.

64.     Shortly before ████████████████ was finalized in June, Kaufmann met with Thorsten Siess and Marc Began at Abiomed, Inc.'s headquarters located in Danvers.

**3.      Consulting Services Agreement and Statement of Work**

65.     Abiomed had another project in its development pipeline—the Impella BTR™, which stands for Bridge to Recovery. The Impella BTR is a percutaneous, weanable, smart heart pump. Abiomed sought assistance in performing computer simulations in connection with the Impella BTR development project. Because of its prior work on simulation projects, Enmodes was a natural choice for the work.

66.     Around the same time, Kaufmann represented that Enmodes was going to shift away from providing services to others and instead focus on building its own products. However, to do so would require working capital. Kaufmann further represented to Abiomed's CTO Siess that, if Abiomed could supply that working capital, it would provide exclusive consulting services for Abiomed and its ongoing projects. Siess understood that Enmodes would be developing and making devices based on its ECMO technology.

67.     At the time of these representations, Abiomed was also developing the Impella ECP. Abiomed thought it would be useful to have assistance in assessing and improving the operation of the proposed pump, including by running simulations. After careful consideration of Kaufmann's representations, in particular his promises of exclusivity, Abiomed selected

Enmodes to perform consulting services on several of its projects, including Impella BTR and Impella ECP.

68.     In 2020, Abiomed Europe and Enmodes entered into a Consulting Services Agreement ("CSA") under which Enmodes was "to provide product development work, including modelling and CAD work related to computational fluid mechanics pertaining to Abiomed medical devices, such as the Impella ECP.

69.     Like the ████████████████████, the CSA contained provisions protecting the confidentiality of Abiomed information and restricting its use.  Section 7 states in pertinent part:

> Consultant acknowledges that technical, scientific, business, legal, strategic, and other information received by it directly or indirectly from Client, or developed by Consultant on behalf of Client in connection with this Agreement, including, without limitation, the Written Materials (collectively "Confidential Information"), is received or developed by Consultant in confidence, shall not be disclosed to third parties. and is to be used only for the purpose for which it is received or developed.  This also applies outside of an executed SOW [Statement of Work] when the parties exchange information in contemplating and discussing services or other activities to be performed in the future.  Consultant shall exercise the same degree of care, however not less than reasonable care, in protecting such information from disclosure as it exercises with its own proprietary information.

████████████████████████████████████████████

████████████████████████████████████████████

████████."

70.     Section 5 of the CSA provides that Enmodes has no ownership, interest or rights in Abiomed's pre-existing intellectual property: "Except as specifically set forth in this section, nothing in this Agreement shall give either Client or Consultant any ownership, interest, or rights in the existing intellectual property of the other party."  Section 5 also states that any intellectual

property rights to any discoveries arising out of Abiomed confidential information, or Enmodes's

work under the CSA, belongs only to Abiomed:

> Client shall own and Consultant hereby assigns to Client all
> intellectual property rights in and to any and all information, ideas,
> methods, data, inventions, works, rights, properties, technology,
> know-how and any improvements and modifications thereto that
> are conceived, created, discovered, developed or invented by
> Consultant its agents, officers or employees which in any manner
> use, arise from, rely on or incorporate the materials or Confidential
> Information of Client, and/or relate to the performance of
> Consultant's services under this Agreement.

71.     In Section 13 of the CSA, Enmodes committed that during the CSA's Term, and

for two years thereafter, it would "not perform services relating to catheter-based blood pumps

for any competitors of Client, which for purposes hereof shall include" nine enumerated

companies or any of their affiliates.

72.     Pursuant to the CSA, Abiomed, Inc. and Enmodes entered into a Statement of

Work (SOW) under the CSA.  In the SOW, Enmodes committed to provide Abiomed, Inc. with

system design and architecture, device development and enhancement, documentation, system

performance analysis and testing, technical leadership, project management and technical

support services.  These services were to be focused on six technical areas, including "EC

design new foldable impeller with reduced insertion and removal forces . . . ."

73.     The CSA guaranteed Enmodes significant compensation.  Abiomed agreed to

"purchase no less than two million Euros . . . of services from [Enmodes] during each contract

year of the Term (the 'Annual Minimum Purchase'), and no less than ten million Euros . . . total

of services from [Enmodes] during the Term (the 'Total Minimum Purchase')".  CSA § 4   The

CSA defines "Term" as a period of four years starting on the agreement's Effective Date,

August 1, 2020.  CSA § 3.  If Abiomed had purchased less than the Annual Minimum Purchase

at the end of a year, or less than the Total Minimum Purchase at the end of the Term, Abiomed

was to pay Enmodes the difference between the applicable Minimum Purchase and the amount

of services Abiomed actually purchased.

74.    The CSA and SOW were negotiated by Marc Began, Wolf Mueller-Hillebrand, and Thorsten Siess of Abiomed, and Kaufmann and Kuns of Enmodes from January to July 2020.  Mr. Began was then Abiomed, Inc.'s Vice President, General Counsel and Secretary.  Mr. Mueller-Hillebrand was Abiomed, Inc.'s Senior Corporate Counsel.  Each is based at Abiomed, Inc.'s corporate headquarters in Danvers, Massachusetts, from where they conducted the negotiations by email, telephone and videoconferences with Enmodes's representatives.

75.    In a May 13, 2020 email sent to Mr. Began, Kaufmann stated that Enmodes did not intend to provide any services to any competitors of Abiomed in the field of catheter-based blood pumps:

> The reason why we were quite frankly surprised with [your request for a non-compete clause] was not because of the clause itself, but because of the timing.  Simply because we already had agreed on something else and this came back without any explanation and at a stage when we were past negotiations.  That being said, *it is anyway not our intention to provide service for another catheter-based pump company.  That's not who we are and that is not what our work ethic is.  We are with Abiomed on this.  We commit to this partnership and we understand your need to protect yourself.*  Hence, we do not have an issue with the clause itself (except for the personnel extension part for legal reasons in Germany, as I said) and *we agree to add this two years non-compete period for catheter-based pumps.*  I think it is common that there should be some sort of compensation for that and that this clause should also not be valid if Abiomed decides to terminate the collaboration early, but that are details which we can surely work out.  For this, please see also my comments on the termination clauses in general.  That's quite important given the commitment we give to this collaboration.  So in summary, *we are fully committed to this and we have no problem to also sign such a clause.*

(Emphases added.)

17

76.     Kaufmann made similar representations orally to Abiomed representatives during the course of the negotiations.  Abiomed made clear that it did not want Enmodes to work with other companies on catheter-based blood pumps, both during the collaboration and after, and Kaufmann assented.

77.     Like the CSA, the SOW guaranteed Enmodes significant compensation.  The SOW provided for an upfront payment of €400,000 from Abiomed to Enmodes.  SOW § 2. Abiomed was then to pay Enmodes a fixed fee of €600,000 every quarter, *i.e.*, €2.4 million per year, "to cover all Services rendered under" under the SOW and CSA.  *Id.*  This provision of the SOW superseded the payment terms in Section 4 of the CSA.

78.     Abiomed ultimately paid Enmodes €5.444 million under the CSA.  Separately, Abiomed paid Enmodes over €6 million more under the Development License Agreement.

79.     On information and belief, Abiomed's payments to Enmodes represented a significant portion of Enmodes's revenue, and were essential to funding Enmodes's internal research and development projects.

80.     Before  Abiomed and Enmodes began negotiating the CSA and SOW, Kaufmann had already entered into yet another Chinese venture, Lungshield Holding Ltd. (HK) ("Lungshield"), a Hong Kong based company whose subsidiary, Lungshield Medical (Suzhou) LLC ("Lungshield Suzhou"), manufactures medical devices.  Established in 2018, Lungshield's projects included a next-generation compressible heart pump (*i.e.*, a product virtually identical to the Impella ECP).

81.     As discussed in greater detail below, in January 2020, Enmodes sold all of its shares to Lungshield, effecting a change of ownership.

82.     Kaufmann and Enmodes' involvement with Lungshield was never disclosed to Abiomed during the course of the negotiations of the CSA and SOW.

## G.     Abiomed Shares and Develops Extensive Confidential Technical Information with Enmodes

83.     Having repeatedly secured contractual commitments from Enmodes that it would not disclose or improperly use Abiomed's valuable and sensitive confidential technical information and having been assured by Kaufmann that Enmodes would not work with Abiomed's competitors, Abiomed disclosed and gave Enmodes access to its confidential information and trade secrets.  Abiomed reasonably believed that Kaufman and Enmodes with whom it had worked for years, would abide by its contractual obligations to keep such information confidential.

84.     Under the CSA and SOW, Abiomed provided Enmodes with detailed confidential digital design (CAD) models of the Impella ECP, the Impella CP, and certain other Abiomed components.  These models were made available to Enmodes in compressed form as a ZIP file on December 1, 2020, via the Abiomed data exchange platform, and were retrieved by Enmodes on December 2, 2020.  On December 3, 2020, Enmodes contacted Abiomed to acknowledge receipt of the CAD drawings, and to identify one file that Enmodes was unable to download properly.

85.     Files downloaded from Abiomed's data exchange platform are hosted in the United States.  Even when accessed in Germany, files are stored, accessed and downloaded from United States servers.

86.     On information and belief, as the Managing Director of Enmodes, Kaufman also had access to Abiomed's confidential information and documents.

87.     In addition to these disclosures concerning Abiomed's products generally, under the CSA and the SOW, Abiomed shared or developed with Enmodes at least three specific pieces of confidential technical information involving special know-how related to the Impella ECP: the geometry of the pump rotor, the ███████████████████████, and the position and design of the cannula outlet openings.

### 1.     Rotor Design

88.     The rotor is an important component of a heart pump. Its function is to move blood through the pump by spinning rapidly in a manner that does not damage blood cells as they move past the rotor. Rotors are the subject of extensive research and development activity at Abiomed and involve considerable know-how.

89.     For the Impella ECP, Abiomed developed a novel compressible rotor. A special feature of this rotor is that it is "tangential", meaning that its rotor blades run offset to the hub of the rotor.

90.     In a conventional radial rotor, a single imaginary line can be drawn through the center of each of the rotor blades as viewed from above, and this line runs through the center point of the rotor shaft. Such a line is shown in Figure 1 at right:

91.     By contrast, in Abiomed's new "tangential" rotor design, drawing an imaginary line through the center of each of the rotor blades results in two separate lines, one for each rotor blade. These lines run parallel to each other, but neither runs through the center point of the rotor shaft. Figure 2 below shows three examples of "tangential" rotor designs. Although the rotor blades shown in these examples are straight, they could also be curved or helical.



**Fig. 1**



**Fig. 2**

92.     Abiomed found that its tangential rotor design leads to considerable advantages when used in heart pumps.  These advantages include (1) higher pumping capacity for a given size (due to larger hydraulically active rotor blade area); (2) the ability to use smaller sizes (due to higher compressibility and the use of reduced material thicknesses); (3) advantages for application in the body during minimally invasive insertion through a catheter (*e.g.*, better compression and deployment); and (4) advantages in terms of material stress (by reducing local stress zones, *e.g.*, compression zones and stretch zones).  For example, a tangential rotor nearly eliminates the "reverse folding" phenomenon, according to which one part of the rotor blade folds in the direction of rotation of the rotor and another folds in the opposite direction, *i.e.*, a rotor blade is folded "on itself".

93.     Abiomed regarded the proposed design of the tangential rotor and its advantages as confidential and valuable information.  Accordingly, the tangential rotor was subject to the confidentiality restrictions and precautions listed above.

94.     Abiomed shared extensive details about the tangential rotor design and its advantages with Enmodes under the CSA and the SOW, including as described below.

95.     For example, the CAD data disclosed to Enmodes included detailed design features of the Impella ECP, including Abiomed's confidential tangential rotor. A sectional view of the rotor in the CAD data is shown in Figure 3 below.



**Fig. 3**

96.     A kick-off meeting concerning implementation of the project was held online on November 26, 2020 and attended by Abiomed and Enmodes employees. A presentation made at the meeting by Gerd Spanier disclosed Abiomed's know-how and formulated certain task for the development of further know-how. The main focus of the work on the tangential rotor design was explained in the kick-off presentation, the slides for which explicitly state that the "Highest Priority [for rotor design improvement is] on safe tangential design introduction."

97.     Findings from Abiomed's tangential rotor studies, including findings about reverse folding, were provided to Enmodes during the November 26, 2020 kick-off presentation.

98.     Subsequently, Enmodes provided engineering service activities, including performing additional technical validation and testing, during which the technical advantageousness of the tangential rotor design was further confirmed.

99.     Under Section 5 of the CSA, intellectual property concerning any discoveries made by Enmodes during the confirmation process—such as the unexpected benefits and results of the tangential rotor design—belong to Abiomed. On information and belief, Enmodes and

Kaufmann misused this confidential information by transferring it to Chinese entities that drafted patent applications referencing the reverse folding phenomenon of tangential rotors that Enmodes learned about while conducting research for Abiomed.



105. 

106.

### 3.    Cannula Outlet Openings

107.    Abiomed also shared valuable know-how with Enmodes concerning the Impella ECP cannula design. The cannula is essentially a hose extending from the pump in the direction of blood flow. The rotating action of the pump rotor draws blood into the blood pump, discharges the blood from the pump into the cannula, and then pushes the blood through openings at the far end of the cannula, as shown in the figure below:



108.    Abiomed disclosed to Enmodes that it had made an important discovery concerning the design and shape of the cannula outlet openings. Abiomed discovered that a design in which at least one outlet opening extends into the conical section (located at the end of the cannula away from the pump) is particularly favorable. An example of such an area is circled in figure 5 below.



conical portion of cannula

outlet opening

cylindrical portion of cannula

**Fig. 5**

109.     Abiomed discovered that the outlet opening design above, in which at least one of the openings extends into the conical end portion of the cannula, has considerable advantage in avoiding the formation of thrombi (blood clots), in particular in the area of the conical end portion. Blood clots are a potentially dangerous side effect of medical devices used within the cardiovascular system, such as heart pumps, because areas in which blood can accumulate and remain stationary are conducive to blood clot formation. Abiomed discovered that the outlet opening design above substantially reduces the risk of blood clot formation at the end of the cannula away from the blood pump.

110.     The outlet opening design above also delivers certain advantages in the production of the heart pumps.

111.     The CAD models that Enmodes retrieved on December 2, 2020 from the Abiomed data exchange platform illustrated the advantageous outlet opening design discovered by Abiomed, as shown in Figure 6 below:



**Fig. 6**

112.    All of the above technical knowledge was valuable, because it was not generally known or readily accessible to persons in the field that usually handle this type of information and was therefore of economic value.  As described above, Abiomed also took care to ensure that its confidential information and know-how was subject to special protective measures.

113.    On information and belief, Enmodes and Kaufmann misused this confidential information and know-how, including by transferring it to Chinese entities that filed patent applications claiming Abiomed's outlet opening designs as their own.

114.    Abiomed filed a patent application relating to the tangential-rotor design in the United States and other countries, but this application was not published until June 2022.  After Abiomed became aware of Enmodes's breach of its confidentiality applications, Abiomed was forced to prepare and file additional patent applications specifically directed to the ███ ███ ███ and cannula outlet openings.

115.    The patent applications referenced above do not include all of the confidential data and information related to the tangential-rotor that was shared with Enmodes.

**H.     Enmodes Employees Worked Closely with Abiomed, Inc. Employees**

116.    Enmodes employees worked closely with and rendered services for Abiomed employees located in Danvers.

117.    For example, the platform lead for the Impella ECP device, Ralph D'Ambrosio, worked out of Abiomed, Inc.'s Danvers headquarters.  Work that Enmodes performed for the Impella ECP project was subject to review by Mr. D'Ambrosio in Danvers.

118.    In the normal course, Enmodes employees shared the results of ongoing projects and research with Danvers-based Abiomed, Inc. employees.  For example, during weekly team meetings related to an oxygenator project, and in email communications beforehand, Philippe Ritter, R&D Project Manager at Enmodes, communicated extensively with Emilia Jahangir, ECMO Platform Leader at Abiomed, about the status of ongoing projects and new test results. Ms. Jahangir is a Danvers-based employee of Abiomed, Inc., and attended the meetings while present in Massachusetts.

119.    Similarly, during the course of the parties' collaboration, Kaufmann emailed reports to Matt Plano, then Vice President of Global Operations at Abiomed, Inc., summarizing the status of various projects, including projects under the CSA umbrella.  For example, in July 2021, Kaufmann emailed Mr. Plano a report on "ECP Phase 1", which contained findings from a simulation setup study.

120.    In addition to Enmodes's services rendered in Massachusetts, in the course of collaborating on various projects covered by the CSA and SOW, Abiomed, Inc. employees shared miscellaneous confidential information with Enmodes.

**I.     Enmodes's Executives Create and Assist Chinese Competitors to Abiomed**

121.    Contrary to the contractual commitments and assurances they had made to Abiomed, Enmodes and Kaufmann improperly disclosed Abiomed's confidential information to

Suzhou Xinqing Medical Technology Co., Ltd. ("MagAssist"), a Chinese competitor of Abiomed.  MagAssist is using Abiomed's information to develop medical devices that can compete with Abiomed's devices, and to file Chinese patent applications on these products.

122.    Months before ███████████ negotiations began, and three years before Enmodes entered into the CSA and the SOW, in May 2017, Kaufmann, Steinseifer and a Chinese co-founder established MagAssist, a Chinese company.  MagAssist represents that its business is focused on heart pumps.

123.    Kaufmann was an active participant in MagAssist.  Abiomed was not aware of Kaufmann's participation in MagAssist at the time that ███████████ was negotiated, and Kaufmann did not disclose his relationship to MagAssist during the ███████████.

124.    MagAssist has been unabashed in identifying itself as a competitor of Abiomed.  MagAssist has directly compared itself to Abiomed in public statements, highlighting Abiomed's success in the United States and Europe and making it clear that MagAssist wants to achieve the same success in China.  For example, on January 13, 2021, MagAssist posted a press release on its website titled "MagAssist, the pioneer for Chinese production of artificial hearts and lungs orients itself to the innovative American stock market giant ABIOMED."  MagAssist also stated that it is the "only company in China that benchmarks Abiomed's latest generation of Impella ECP, ECMO, and other product pipelines . . . ."

125.    Even before the CSA and the SOW were executed, Enmodes and Kaufmann were apparently offering engineering and technical services to MagAssist.  Abiomed has now learned that as early as July 2020—a month before the CSA and SOW were signed—Kaufmann had been instrumental in designing and optimizing the flow paths for MagAssist's products, and Enmodes had provided MagAssist with complete computational resources to complete the first

phase of its fluid mechanics design.  At the same time, Enmodes had built parallel computing resources for MagAssist, trained specialist engineers, and helped to set up a fluid mechanics experimental platform.

126.   Kaufmann never informed Abiomed about MagAssist's existence or the work that Enmodes and Kaufmann did for MagAssist before the parties entered into the CSA and the SOW.

127.   Kaufmann's representation on May 13, 2020 that he had no intention of providing services to another catheter-based pump company was false when made.  Kaufmann had already co-founded MagAssist, and he and Enmodes were already providing catheter-based pump services to that company.

128.   Kaufmann made this representation with the intent to deceive Abiomed in entering the CSA and SOW because Kaufmann knew that Abiomed's willingness to enter into the CSA depended on assurances that Kaufmann and Enmodes would not provide catheter-based pump services to companies that compete with it.

129.   Abiomed reasonably relied on Kaufmann's false representation in agreeing to enter into the CSA and SOW because it was unaware of any evidence to the contrary and did not believe Kaufmann was dishonest.

130.   Abiomed would not have entered into the CSA and SOW had it known that Kaufmann and Enmodes were providing catheter-based pump services to an Abiomed competitor, especially in light of how carefully Abiomed protects its confidential information and how important that information is to Abiomed's competitive position.

131.   Abiomed only began learning of Kaufmann's true intentions several years later. On May 6, 2022, Kaufmann told Abiomed's Siess that Chinese investors were purportedly

pressuring him to develop heart pumps similar to Abiomed's Impella for the Chinese market. Kaufmann told Abiomed he had not yet made up his mind about whether he would take these investors up on their offers, but he was having difficulty resisting this opportunity. Kaufmann did not mention that MagAssist, the company he had co-founded, was already positioning itself as a heart pump competitor to Abiomed.

132. Dr. Siess responded by urging Kaufmann not to agree to these purported requests from Chinese investors.

133. On May 20, 2022, Kaufmann told Dr. Siess he supposedly "could not refuse" the Chinese investors' request, and he would help them develop a copy of the Impella. Kaufmann again failed to mention that he was already heavily involved with aspiring Chinese competitors to Abiomed.

134. Dr. Siess told Kaufmann that this decision meant that Abiomed could no longer work with Enmodes.

135. MagAssist is not the only Chinese competitor with which Kaufmann is associated. Abiomed has since learned that Kaufmann is also the Managing Director of Lungshield. As of January 20, 2022, Lungshield is Enmodes's sole shareholder. Enmodes is Lungshield's sole shareholder. Kaufmann did not inform Abiomed of Lungshield, or explain the Enmodes-Lungshield relationship.

136. Lungshield is the sole shareholder of Lungshield Suzhou. News related to investment in Lungshield Suzhou indicates that Lungshield Suzhou focuses on ECMO technology and is also working on a copy of Abiomed's Impella heart pump.

**J.      Enmodes Breaches the CSA by Providing Services for MagAssist**

137.     Section 13 of the CSA prohibits Enmodes from "perform[ing] services relating to catheter-based blood pumps for any competitors of [Abiomed Europe]", "including" (but not limited to) certain enumerated companies.

138.     Enmodes breached the CSA, at least by providing engineering and technical consulting services to MagAssist, a company that is developing catheter-based blood pumps. For example, Enmodes provided computing resources to MagAssist for fluid mechanics design. Enmodes also established parallel computing resources for MagAssist, trained professional engineers, and assisted MagAssist in building a fluid mechanics experimental platform.

**K.      Enmodes Misappropriates Abiomed's Confidential Information**

139.     Enmodes's breach of its contractual obligations did not stop with merely consulting for MagAssist.  Enmodes breached its confidentiality and intellectual property obligations by disclosing Abiomed's proprietary technical information to MagAssist, thereby misappropriating and misusing Abiomed's valuable intellectual property.

140.     Section 7 of the CSA requires Enmodes not to disclose the confidential information that Abiomed shared with Enmodes, or that was developed by Enmodes under the CSA and SOW, to third parties or to use that information for a purpose other than that for which it was shared or developed and only on behalf of development efforts for Abiomed.

141.     Enmodes breached Section 7 by disclosing Abiomed's confidential information to MagAssist.  MagAssist has applied for at least *nine* patents in China that contain confidential information that Abiomed shared with Enmodes pursuant to the CSA:  CN113856036A, CN114010937A, CN114129890A, CN114344702A, CN114522338A, CN215135915U, CN216061676U, CN216439825U, and CN216439826U.

31

142.    Compounding the damage caused by Enmodes's disclosure of Abiomed confidential information, MagAssist requested that the applications it filed be examined on an expedited basis, which made them publicly available earlier than they otherwise would have been.

143.    Abiomed was not aware that its confidential information had been used in these patent applications until it recently became aware of them. Abiomed has now learned that the applications contained at least the following Abiomed confidential information, which Abiomed had shared with Enmodes under the CSA and the SOW.

144.    MagAssist included a tangential rotor in patent application CN114344702A ("CN '702A"), which is directed to a heart pump. The rotor is shown in Fig. 10 of the application, which is reproduced below.



The rotor in CN '702A has the same tangential and reverse-folding design features as the rotor Abiomed developed for the Impella ECP and that it disclosed to Enmodes.

145.    The use of Abiomed's tangential rotor features can be seen in the comparison below of Fig. 10 from MagAssist's Chinese patent application (on the left) with the Abiomed

rotor design that Abiomed made available to Enmodes in a CAD model in December 2020  on the right):



The orange markings inserted into the figures make it clear that the same tangential rotor concept as communicated by Abiomed to Enmodes in the context of the consulting project was used in CN '702A.

146.    The MagAssist Chinese patent applications explicitly mention the "reverse folding" characteristic of the tangential rotor.  Paragraph 0075 of CN '702A states:

> [0075] In another embodiment, as shown in Fig. 11, a position point is the outer *reverse bend position point D2*, wherein the position point is located between the wing root 4112 and the wing tip 4111.

(Emphasis added.)

147.    The "reverse folding" characteristic is also mentioned in main claim 1 of MagAssist's Chinese patent application CN 114010937A ("CN '937A"), which is directed to a catheter heart pump:

> 1. An impeller for a catheter pump, the impeller being receivable in the pump housing of the catheter pump and comprising a hub and blades disposed on the hub; the blades having a blade tip, a blade root disposed on the hub, and *a reverse kink portion* disposed between the blade root and the blade tip; said wing root extends in

> a radial direction along a first circumferential direction obliquely
> toward said reverse kink portion, and said reverse kink portion
> extends in a radial direction along a second circumferential
> direction opposite to said first circumferential direction obliquely
> toward said wing tip.

(Emphasis added.)

148.    This feature is also described in more detail in the descriptions in paragraph

0062-0070 of MagAssist CN '937A patent application. Paragraph 0065 states:

> [0065] The wing blades 411 include a first portion A located
> between the wing root 4112 and the *reverse bend portion* D2D3,
> and a second portion B located between the reverse bend portion
> D2D3 and the wing tip 4111.

(Emphasis added.)

149.    Not only does CN '937A disclose the reverse-folding characteristic of the

tangential rotor, it also references Enmodes's findings made in connection with the service it

rendered under the CSA and SOW:

> [0066] During investigations by the inventors, it was found that the
> first part A and the second part B are each subjected to several
> acting forces during the rotation of the impeller 410, such as the
> centrifugal force from the rotation, the reaction force exerted by
> the fluid on the impeller blades 411, the back pressure of the fluid,
> and so on.

As used here, the term "impeller" is synonymous with "rotor". The investigation of forces acting

on the rotor that is discussed in this passage was one aspect of Enmodes' assignment for

Abiomed under the CSA and SOW. The SOW expressly states that Enmodes's "Services will be

focused on" a list of subjects that include "ECP design new foldable impeller with reduced

insertion and removal forces . . .".

150.    As noted earlier, at Abiomed's instruction, Enmodes also ███████████ ███

██████████████████████████████████████████████████████████

████████████████████████████████████████ █

████████████████████████    Fig. 7 of MagAssist's CN '937A:



Fig 7:   ████████████████   CN '937A (Fig 7)

███████████████████████████████████████████ ███

███████████████████████████████████████████ ███

████████████████████████

151.   Abiomed's confidential information concerning cannula outlet openings w re also used in MagAssist's Chinese patent and utility model applications.

152.   For example, Abiomed's design was used in Figs. 3, 6 and 7 of the MagAs ist's Chinese utility model CN 216439825U ("CN '825U"), shown below:



Outlet openings in Chinese utility model application CN '825U (Fig. 3)



Outlet openings in Chinese utility model application CN '825U (Fig. 6)



Outlet openings in Chinese utility model application CN '825U (Fig. 7)

153.   A comparison of Fig. 7 of MagAssist's CN '825U (left) with the design of Abiomed's outlet openings (right) transmitted to Enmodes on December 1, 2020, is shown below.



These figures demonstrate that a key design feature of Abiomed's outlet opening—that at least part of it extends from the cylindrical body of the cannula into the conical end of cannula– was copied in MagAssist's patent application.  In particular, CN '825U discloses that "*[p]art of blood outlet 21 is located in the proximal conical section 111,* whereby the outputted blood generally forms an axial flow, and together with the part of blood outlet 14 of the cylindrical section 110 ensures the flow of blood outlet 14 and avoids loss of flow direction".  (CN '825U at 0089 (emphasis added).)

154.    The close personal and economic ties between Enmodes and MagAssist described above make plain that Enmodes and Kaufmann disclosed Abiomed's confidential information to MagAssist, a company that, like Enmodes, was founded by Kaufmann and Steinseifer.  Indeed, MagAssist could not have known about, and included in its Chinese patent and utility model applications, the very precise design elements set forth above without knowledge of Abiomed's confidential technical information.

155.    These disclosures to MagAssist violated Section 7 of the CSA, which provides that

> Consultant acknowledges that technical, scientific, business, legal, strategic and other information received by it directly or indirectly

> from Client, or developed by Consultant on behalf of Client in connection with this Agreement, including, without limitation, the Written Materials (collectively "Confidential Information"), is received or developed by Consultant in confidence, shall not be disclosed to third parties, and is to be used only for the purpose for which it is received or developed. This also applies outside of an executed SOW [Statement of Work] when the parties exchange information in contemplating and discussing services or other activities to be performed in the future. Consultant shall exercise the same degree of care, however not less than reasonable care, in protecting such information from disclosure as it exercises with its own proprietary information.

156.   These disclosures to MagAssist also violated Section 5 of the CSA. Section 5 provides that the CSA does not give Enmodes and Kaufmann any rights to Abiomed intellectual property. To the contrary, it provides that

> Client shall own and Consultant hereby assigns to Client all intellectual property rights in and to any all information, ideas methods, data, inventions, works, rights, properties, technology, know-how and any improvements and modifications thereto that are conceived, created, discovered, developed or invented by Consultant, its agents, officers or employees which in any manner use, arise from, rely on or incorporate the materials or Confidential Information of Client, and/or relate to the performance of Consultant's services under this Agreement.

157.   "[I]ntellectual property" includes confidential information and trade secret such as Abiomed's tangential rotor, cannula outlet opening designs and rotor liner that were disclosed to Enmodes and whose advantages were discovered or confirmed by Enmodes during performance of services for Abiomed under the CSA/SOW.

158.   Enmodes breached Section 5 by disclosing this confidential information and trade secrets to MagAssist, which then included them in its own intellectual property.

**L.      Enmodes's and Kaufmann's Actions Have Caused Continuing Harm to Abiomed**

159.    Abiomed sells its products throughout the world, so any competing products exported from China present a commercial threat to Abiomed. Abiomed also plans to commercialize the Impella ECP in China.

160.    Enmodes's and Kaufmann's actions have harmed Abiomed by destroying the value of Abiomed's confidential information and trade secrets and by facilitating development of Chinese products, and potentially others, that will compete with Abiomed's products. Because Abiomed's patent applications including this information did not begin publishing until June of 2022, other companies—including Abiomed's competitors in China and the rest of the world—have had access to this competitively sensitive information earlier than they otherwise would have. The premature disclosure of this information in Chinese patent applications has given MagAssist and other competitors a head-start in developing competing products, as well as to begin designing around Abiomed's intellectual property.

161.    Enmodes's and Kaufmann's actions will cause harm to Abiomed, Inc. in Massachusetts because the Impella ECP will be manufactured or assembled in and sold from Massachusetts and because the revenue from the Impella ECP will flow to a Massachusetts company, Abiomed, Inc., that employs hundreds of people in the Commonwealth. The development of competing products will hurt Abiomed's sales and revenues from the Impella ECP, harming its competitive position. The development of competing products may also harm Abiomed's market position, including by reducing its stock price.

## CLAIMS

### COUNT I
### BREACH OF CONTRACT FOR VIOLATION OF SECTION 7 OF THE CSA
### (BY PLAINTIFFS AGAINST ENMODES)

162.    Plaintiffs repeat and incorporate by reference the allegations contained in

paragraphs 1−161 as if fully set forth herein.

163.    The CSA is governed by German law.  (*See* CSA § 17.)  Under German law the

CSA is a valid contract binding upon Abiomed Europe and Enmodes.

164.    Abiomed has performed its obligations under the Consulting Services Agreement.

165.    Section 7 of the CSA prohibits Enmodes from disclosing confidential information

that it receives from Abiomed pursuant to the CSA or that it develops in connection with the

CSA and not to use that information for any purposes other than its work under the CSA.

166.    Enmodes breached this obligation at least by disclosing Abiomed's confidential

information to MagAssist, including the design of the tangential rotor, ██████████ and

cannula outlet openings as detailed above.

167.    Enmodes's breaches have harmed Abiomed by destroying the value of Abiomed's

confidential information and trade secrets and by facilitating development of products, including

by the Chinese companies MagAssist and Lungshield, that will compete with Abiomed's

products.  By receiving confidential information and trade secrets that Abiomed spent significant

time and money developing, as well as services from Enmodes, MagAssist will be able to speed

up development of competing products and do so at a lower cost, as will other competitors that

gain access to this information through MagAssist's Chinese patent applications.

168.    Enmodes's breaches have and will cause harm to Abiomed, Inc. in Massachusetts

because the Impella ECP will be manufactured in and sold from Massachusetts and because the

revenue from the Impella ECP will flow to a Massachusetts company, Abiomed, Inc., that

employs hundreds of people in the Commonwealth. The development of competing products will hurt Abiomed's sales and revenues from the Impella ECP, harming its competitive position. The development of competing products may harm Abiomed's market position, including by causing a reduction in stock price.

169. Accordingly, Plaintiffs should be awarded damages in an amount to be determined at trial, an injunction against further breach and other appropriate relief.

## COUNT II
## BREACH OF CONTRACT FOR VIOLATION OF SECTION 13 OF THE CSA
## (BY PLAINTIFFS AGAINST ENMODES)

170. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1–161 as if fully set forth herein.

171. The CSA is governed by German law. (*See* CSA § 17.) Under German law, the CSA is a valid contract binding upon Abiomed Europe and Enmodes.

172. Abiomed has performed its obligations under the Consulting Services Agreement.

173. Section 13 of the CSA states that Enmodes cannot perform services relating to catheter-based blood pumps for any of Abiomed Europe's competitors.

174. Enmodes breached this obligation at least by performing consulting services for MagAssist relating to catheter-based blood pumps, such as providing computational resources for fluid mechanics design and building a fluid mechanics experimental platform.

175. Enmodes's breaches have harmed Abiomed by destroying the value of Abiomed's confidential information and trade secrets and by facilitating development of products, including by the Chinese companies MagAssist and Lungshield, that will compete with Abiomed's products. By receiving confidential information and trade secrets that Abiomed spent significant time and money developing, as well as services from Enmodes, MagAssist will be able to speed

up development of competing products and do so at a lower cost, as will other competitor that gain access to this information through the Chinese patent applications.

176. Enmodes's breaches have and will cause harm to Abiomed, Inc. in Massachusetts because the Impella ECP will be manufactured in and sold from Massachusetts and because the revenue from the Impella ECP will flow to a Massachusetts company, Abiomed, Inc., that employs hundreds of people in the Commonwealth. The development of competing products will hurt Abiomed's sales and revenues from the Impella ECP, harming its competitive position. The development of competing products may harm Abiomed's market position, including by causing a reduction in stock price.

177. Accordingly, Plaintiffs should be awarded damages in an amount to be determined at trial, an injunction against further breach and other appropriate relief.

**COUNT III**
**BREACH OF CONTRACT FOR VIOLATION OF SECTION 5 OF THE CSA**
**(BY PLAINTIFFS AGAINST ENMODES)**

178. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1–161 as if fully set forth herein.

179. The CSA is governed by German law. (*See* CSA § 17.) Under German law, the CSA is a valid contract binding upon Abiomed Europe and Enmodes.

180. Abiomed has performed its obligations under the Consulting Services Agreement.

181. Section 5 of the CSA provides that any intellectual property of Abiomed or developed by Enmodes pursuant to the CSA is owned by Abiomed. Under Section 5, Enmodes agreed to assign to Abiomed all intellectual property developed by Enmodes pursuant to the CSA.

182. Enmodes breached this obligation at least by misappropriating Abiomed's proprietary information and trade secrets to assist MagAssist in filing Chinese patent

applications, as discussed above, notwithstanding his agreement that all intellectual property developed by Enmodes pursuant to the CSA is or would be assigned to Abiomed.

183.    Enmodes's breaches have harmed Abiomed by destroying the value of Abiomed's confidential information and trade secrets and by facilitating development of products, including by the Chinese companies MagAssist and Lungshield, that will compete with Abiomed's products. By receiving confidential information and trade secrets that Abiomed spent significant time and money developing, as well as services from Enmodes, MagAssist will be able to speed up development of competing products and do so at a lower cost, as will other competitors that gain access to this information through the Chinese patent applications.

184.    Enmodes's breaches have and will cause harm to Abiomed, Inc. in Massachusetts because the Impella ECP will be manufactured in and sold from Massachusetts and because the revenue from the Impella ECP will flow to a Massachusetts company, Abiomed, Inc., that employs hundreds of people in the Commonwealth.  The development of competing products will hurt Abiomed's sales and revenues from the Impella ECP, harming its competitive position. The development of competing products may harm Abiomed's market position, including by causing a reduction in stock price.

185.    Accordingly, Plaintiffs should be awarded damages in an amount to be determined at trial, an injunction against further breach, assignment of all intellectual property developed by Enmodes pursuant to the CSA (in specific performance) and other appropriate relief.

**COUNT IV**
**TRADE SECRET MISAPPROPRIATION UNDER THE MASSACHUSETTS UNIFORM**
**TRADE SECRETS ACT**
**(BY PLAINTIFFS AGAINST ALL DEFENDANTS)**

186.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1–161 as if fully set forth herein.

187.    Plaintiffs' confidential information about the design of the tangential rotor, ███ ████, and outlet openings of heart pump is information used in the medical device industry.

188.    Plaintiffs' confidential information constitutes trade secrets because it provides economic advantage from not being generally known to, and not being readily ascertainable by proper means by, others who might obtain economic advantage from its acquisition, disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

189.    Plaintiffs' confidential information gives Plaintiffs an opportunity to obtain an advantage over competitors who do not know or use it because it was developed over decades for use in a next generation heart pump that will offer advantages, including a narrower insertion diameter, over products currently on the market.

190.    Plaintiffs have taken all proper and reasonable measures to preserve the secrecy of their confidential information by thoroughly classifying sensitive data, training their employees on confidentiality, specifying how to handle secret information though a Code of Conduct and employee handbook, and implementing strict IT security precautions.

191.    Defendants acquired Abiomed's confidential information under circumstances giving rise to a duty to limit its disclosure or use because the information was disclosed under the

CSA, which imposed such a duty on Enmodes, and under which the information was disclosed to Kaufmann as agent for Enmodes.

192. Defendants knew that they were under such a duty because Enmodes entered into the CSA, Kaufmann executed the CSA, and Kaufmann obtained the information under the CSA as agent to Enmodes.

193. Defendants disclosed and used Abiomed's confidential information using improper means because they did so in breach of the CSA, including, among other things, by disclosing them to MagAssist.

194. Defendants have harmed Abiomed by destroying the value of Abiomed's confidential information and trade secrets and by facilitating development of products that will compete with Abiomed's products. Because Abiomed's patent applications including this information did not begin publishing until June 2022, the premature disclosure of this information in Chinese patent applications has given MagAssist and other competitors a head-start in developing competing products, as well as to begin designing around Abiomed's intellectual property.

195. Defendants' actions will cause harm to Abiomed, Inc. in Massachusetts because the Impella ECP will be manufactured in and sold from Massachusetts and because the revenue from the Impella ECP will flow to a Massachusetts company, Abiomed, Inc., that employs hundreds of people in the Commonwealth. The development of competing products will hurt Abiomed's sales and revenues from the Impella ECP, harming its competitive position.

196. Accordingly, Plaintiffs should be awarded damages in an amount to be determined at trial and other appropriate relief.

## COUNT V
## TRADE SECRET MISAPPROPRIATION UNDER THE U.S. DEFEND TRAD.
## SECRETS ACT
## (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

197.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1–161 as if fully set forth herein.

198.    Plaintiffs' confidential information about the design of the tangential rotor, ███, and outlet openings is scientific, technical or engineering information.

199.    Plaintiffs' confidential information is related to the Impella ECP, which will be marketed and sold in interstate commerce in the United States and in foreign countries, such as China.

200.    Plaintiffs' confidential information derives independent economic value from being not generally known to or ascertainable through proper means by persons in the field that usually handle this type of information because it was the result of decades of confidential development work.

201.    Plaintiffs have taken reasonable measures to keep their confidential information secret by, among other things, executing strict confidentiality agreements with employees and third parties before disclosing secret knowledge to them, thoroughly classifying sensitive data, training their employees on confidentiality, specifying how to handle secret information through a Code of Conduct, and implementing strict IT security precautions.

202.    Defendants acquired Plaintiffs' confidential information under circumstances giving rise to a duty to maintain its secrecy because the information was disclosed under the CSA, which imposed such a duty on Enmodes, and under which the information was disclosed to Kaufmann as agent for Enmodes.

203.   Defendants knew that they were under such a duty because Enmodes entered into the CSA, Kaufmann executed the CSA, and Kaufmann obtained the information under the CSA as agent to Enmodes.

204.   Defendants disclosed and used Abiomed's confidential information using improper means because they did so in breach of the CSA, including, among other things, by disclosing them to MagAssist.

205.   Defendants have harmed Abiomed by destroying the value of Abiomed's confidential information and trade secrets and by facilitating development of products that will compete with Abiomed's products.  Because Abiomed's own patent applications including this information did not begin publishing until June 2022, the premature disclosure of this information in Chinese patent applications has given MagAssist and other competitors a head-start in developing competing products, as well as to begin designing around Abiomed's intellectual property.

206.   Defendants' actions will cause harm to Abiomed, Inc. in Massachusetts because the Impella ECP will be manufactured in and sold from Massachusetts and because the revenue from the Impella ECP will flow to a Massachusetts company, Abiomed, Inc., that employs hundreds of people in the Commonwealth.  The development of competing products will hurt Abiomed's sales and revenues from the Impella ECP, harming its competitive position.

207.   Accordingly, Plaintiffs should be awarded damages and other appropriate relief.

### COUNT VI
### IN THE ALTERNATIVE, MISAPPROPRIATION OF CONFIDENTIAL BUSINESS INFORMATION
### (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

208.   Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1–161 as if fully set forth herein.

209.    Plaintiffs' confidential information about the design of the tangential rotor ███████, and outlet openings is confidential business information.

210.    Defendants acquired Abiomed's confidential information under circumstances giving rise to a duty to limit its disclosure or use because the information was disclosed under the CSA, which imposed such a duty on Enmodes, and under which the information was disclosed to Kaufmann as agent for Enmodes.

211.    Defendants knew that they were under such a duty because Enmodes entered into the CSA, Kaufmann executed the CSA, and Kaufmann obtained the information under the CSA as agent to Enmodes.

212.    Defendants disclosed and used Abiomed's confidential information using improper means because they did so in breach of the CSA, including, among other things, by disclosing them to MagAssist.

213.    Defendants' actions have harmed Abiomed by destroying the trade secret value of Abiomed's confidential information and by facilitating development of products that will compete with Abiomed's products.  Because Abiomed's patent applications including this information did not begin publishing until June 2022, the premature disclosure of this information in Chinese patent applications has given MagAssist and other competitors a head-start in developing competing products, as well as to begin designing around Abiomed's intellectual property.

214.    Defendants' actions will cause harm to Abiomed, Inc. in Massachusetts because the Impella ECP will be manufactured in and sold from Massachusetts and because the revenue from the Impella ECP will flow to a Massachusetts company, Abiomed, Inc., that employs

hundreds of people in the Commonwealth.  The development of competing products will hurt Abiomed's sales and revenues from the Impella ECP, harming its competitive position.

215.    Accordingly, Plaintiffs should be awarded damages and other appropriate relief.

**COUNT VII**
**IN THE ALTERNATIVE, FRAUDULENT INDUCEMENT**
**(BY PLAINTIFFS AGAINST ALL DEFENDANTS)**

216.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1–161 as if fully set forth herein.

217.    In order to induce Abiomed to enter into the CSA, Kaufmann made the false statement to Abiomed that Enmodes did not intend to provide catheter-based pump services to companies that compete with Abiomed.  At the time he made this statement to Abiomed, Kaufmann knew it was false because Kaufmann had already founded a company, MagAssist, that competes with Plaintiffs and Kaufmann and Enmodes were already providing catheter-based pump services to that company.

218.    Kaufmann's statement was material because Abiomed would not have entered into the CSA had it known that Defendants were providing catheter-based pump services to a competitor, especially in light of how carefully Abiomed protects its confidential information.

219.    Kaufmann made the statement with the intent to deceive because he knew that Abiomed's willingness to enter into CSA depended on assurances that Defendants would not provide catheter-based pump services to companies that compete with Abiomed, including because Abiomed had asked for a non-competition clause to be included in the parties' agreement.

220.    Kaufmann made the statement while he was an employee of Enmodes.

221.   Kaufmann made the statement within the scope of his employment for Enmodes and in furtherance of Enmodes' work because he was negotiating the CSA on behalf of Enmodes when he made the statement.

222.   Kaufmann made the statement in furtherance of Enmodes's work because Kaufmann was acting on behalf of Enmodes to contract with Abiomed to earn revenue.

223.   Abiomed reasonably relied on Kaufmann's false statement in agreeing to enter into the CSA and SOW because it was unaware of any evidence to the contrary and did not believe Kaufmann was dishonest.

224.   Defendants' actions have harmed Abiomed by inducing it to enter into the CSA and disclose confidential information to Enmodes, the premature disclosure of which destroyed the trade secret value of that information and facilitated development of products that will compete with Abiomed's products.  Because Abiomed's patent applications including this information did not begin publishing until June 2022, the premature disclosure of this information in Chinese patent applications has given MagAssist and other competitors a head-start in developing competing products, as well as to begin designing around Abiomed's intellectual property.

225.   Defendants' actions will cause harm to Abiomed, Inc. in Massachusetts because the Impella ECP will be manufactured in and sold from Massachusetts and because the revenue from the Impella ECP will flow to a Massachusetts company, Abiomed, Inc., that employs hundreds of people in the Commonwealth.  The development of competing products will hurt Abiomed's sales and revenues from the Impella ECP and will force Abiomed to cut back on its research and development activities, harming its competitive position.

226.   Accordingly, Plaintiffs should be awarded damages and other appropriate relief.

## COUNT VIII
## IN THE ALTERNATIVE, UNJUST ENRICHMENT
## (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

227.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1–161 as if fully set forth herein.

228.    Abiomed conferred a benefit on Defendants by providing payment for Defendants' performance of consulting services under the CSA and the SOW and by disclosing Abiomed's valuable trade secrets or confidential information to Defendants, which permitted Kaufmann to benefit from MagAssist, the Chinese company that he co-founded and to which he and Enmodes disclosed Abiomed's trade secret or confidential information.

229.    Defendants were aware of the benefit Abiomed conferred upon it because it knowingly accepted the payment Abiomed provided for Enmodes' consulting services, and knowingly received Defendants' trade secrets or confidential information.

230.    Because Defendants knowingly made misrepresentations to Abiomed during the negotiation of the CSA and breached the CSA by improperly using and disclosing Abiomed's confidential information, Defendants retained the benefits conferred upon them by Abiomed under inequitable circumstances.

231.    Accordingly, Abiomed should be awarded damages and other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter the following relief:

1.    Awarding to Plaintiffs damages in an amount to be determined at trial;

2.    Enjoining Defendants from disclosing or using Plaintiffs' confidential information for any purpose not expressly permitted in the CSA;

3.    Ordering Defendants to assign all IP developed pursuant to the CSA to Plaintiffs;

4.    Awarding Plaintiff attorneys' fees and costs incurred in prosecuting this action; and

5.     Granting Plaintiffs all such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs ABIOMED, INC. and ABIOMED EUROPE GmbH hereby demand a jury trial on all claims and issues so triable.

Dated: October 17, 2022

Respectfully submitted,

ABIOMED, INC., and
ABIOMED EUROPE GmbH

By their Attorneys,

*/s/ Joseph L. Stanganelli*

Joseph L. Stanganelli (BBO# 628958)
Barclay Damon LLP
160 Federal Street, Suite 1001
Boston, Massachusetts 02110
(617) 274-2900
jstanganelli@barclaydamon.com

Of Counsel

Keith R. Hummel (*pro hac vice* forthcoming)
Benjamin Gruenstein (*pro hac vice* forthcoming)
Retley G. Locke, Jr. (BBO# 708855)
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
khummel@cravath.com
bgruenstein@cravath.com
rlocke@cravath.com

FILED
ESSEX SUPERIOR COURT
22 OCT 17 PM 3:57