# Exhibit A-1

**(Redacted)**

# NORDEMANN

NORDEMANN - Kurfürstendamm 59 - 10707 Berlin

Prof. Dr. Christian Czychowski

Kurfürstendamm 59
10707 Berlin

T +49 30 863 2398 81
F +49 30 863 2398 21

christian.czychowski@nordemann.de
www.nordemann.de

Your sign / your. ref.

Our sign / our ref.
**ABME60005**

Public Prosecutor's Office
Aachen Dept. 3 Economic
Crime
Adalbertsteinweg 92
52070 Aachen

Date / date
**August 3, 2022**

**per beA**

We reimburse on behalf of and in the name of the company represented by us

**ABIOMED Europe GmbH**
represented by its managing directors Dr. Thorsten Sieß and Dirk Gerhard Michels
Neuenhofer Weg 3, 52074 Aachen

(hereinafter: **complainant**) **Criminal complaint**

against
**Dr. Tim Arne Simon Kaufmann**
Erzbergerallee 95, 52066 Aachen

(hereinafter: **defendant)**

and

**unknown**

on suspicion of criminal violation of business secrets pursuant to § 23 GeschGehG and all other possible offenses. Proper authorization is assured by a lawyer.

Prof. Dr. Axel Nordemann
Rechtsanwalt / Attorney at Law (Germany) [1]
Partner

Prof. Dr. Jan Bernd Nordemann, LL.M. (Cambridge)
Rechtsanwalt / Attorney at Law (Germany) [1]
Fachanwalt für Urheber- und Medienrecht *
Fachanwalt für gewerblichen Rechtsschutz **
Partner

Prof. Dr. Christian Czychowski
Rechtsanwalt / Attorney at Law (Germany) [1]
Specialist attorney for information technology law
*** Specialist attorney for copyright and media law
* Partner

Dr. Anke Nordemann-Schiffel, Maître en droit
Rechtsanwältin / Attorney at Law (Germany) [2]
Specialist in Copyright and Media Law * Specialist
in Intellectual Property Law ** Partner

Dr. Thomas W. Boddien
Rechtsanwalt / Attorney at Law (Germany) [1]
Partner

Dr. Julian Waiblinger
Rechtsanwalt / Attorney at Law (Germany) [1]
Specialist attorney for copyright and media law *

Partner

Dr. Stanislaus Jaworski
Rechtsanwalt / Attorney at Law (Germany) [1]
Partner

Renate Hellenthal, LL.M.
Rechtsanwältin / Attorney at Law (Germany) [2]

Luisa Siesmayer, LL.M.
Rechtsanwältin / Attorney at Law (Germany) [1]

Dr. Julian Klagge
Rechtsanwalt / Attorney at Law (Germany) [1]

Dr. Viktoria Kraetzig
Rechtsanwältin / Attorney at Law (Germany) [1]

Marthe Schaper, LL.M.
Rechtsanwältin / Attorney at Law (Germany) [1]
Specialist attorney for industrial property protection **

Sebastian Dworschak, Dipl.-Wirt.-Ing. Attorney at
Law / Attorney at Law (Germany) [1]

Hannah Gennen
Rechtsanwältin / Attorney at Law (Germany) [1]

Dr. Henrike Strobl, lic. en droit
Rechtsanwältin / Attorney at Law (Germany) [1]

Olaf Wolters
Rechtsanwalt / Attorney at Law (Germany) [1]
Of Counsel

Dr. Jan Ehrhardt
Rechtsanwalt / Attorney at Law (Germany) [1]
Of Counsel

Representatives before EUIPO
Representatives before EUIPO

[1] Berlin        [2] Potsdam

* Certified Copyright and Media Lawyer
** Certified Industrial Property Rights Lawyer
*** Certified Information Technology Lawyer

Nordemann Czychowski & Partner Rechtsanwälte mbB Berlin - Potsdam - AG
Potsdam PR 162 P

Informationen zum Datenschutz / data protection information: www.nordemann.de/datenschutz

34.639

NORDEMANN

At the same time we provide

### Criminal complaint

from all legally relevant points of view.

## Preliminary note

With reference to the telephone calls of July 8 and July 12, 2022 between Mr. Poth, State Attorney, Mr. Kehr, Detective Superintendent, and Prof. Dr. Czychowski, we describe below the events surrounding the violation of trade secrets of the complainant.

The complainant and the company enmodes GmbH, whose managing director is the defendant, had a business relationship at the time of the infringement. In this context, the company enmodes GmbH and thus also the defendant as its managing director obtained business secrets of the complainant. These were apparently disclosed and used without authorization. The complainant had to learn that extensive know-how had been incorporated into Chinese patent and utility model applications. In the course of this, it also emerged that the defendant is personally and economically connected with several Chinese companies as co-founder, managing director or consultant.

In order to enforce civil law claims against enmodes GmbH and the defendant, the complainant has already applied to Cologne Regional Court for an inspection of the business premises of enmodes GmbH and the private premises of the defendant in combined independent evidence and preliminary injunction proceedings in accordance with the so-called "Düsseldorf inspection practice" (hereinafter: application). This application is attached as **Annex A 1** and sets out the facts of the case and the status of the dispute in more detail. In the civil proceedings, the defendant is designated as defendant II and enmodes GmbH is designated as defendant I. The defendant is also designated as defendant II. The Cologne Regional Court granted the inspection request in full in its decisions of July 4, 2022. The inspection took place on July 11, 2022.

In order to keep this brief as clear as possible, we summarize the facts of the case and the legal assessment and refer in places to the notice of motion as a supplement.

NORDEMANN

## A.   Facts

### I.   Presentation of the participants

The advertiser is a company of the Abiomed Group, whose U.S. company is listed on the stock exchange and manufactures medical devices for mechanical circulatory support and/or percutaneous ventricular support (=external and implantable circulatory support). This includes in particular the artificial heart pumps of the advertiser, which it develops and sells under the name Impella. The advertiser is based in Aachen. With its subsidiary, ECP Entwicklungsgesell-schaft mbH, based in Berlin, it researches and develops, among other things, new innovative heart pump technologies, such as the latest generation of the Impella heart pump, the Impella ECP.

**Proof:**                Abiomed company presentation from January 12. 2022

                                                    **Attachment A 2**

                  Trade register excerpt ABIOMED Europe GmbH from the June 29, 2022

                                                    **Attachment A 3**

                  Commercial register excerpt and list of shareholders of ECP Entwicklungsgesellschaft mbH

                                                    **Plant volume A 4**

The defendant is involved in a network of German and Chinese companies. First, he is the managing director and founder of the German enmo- des GmbH, a company also based in Aachen, which is active in the field of engineering services with a focus on numerical simulations and their validation.

**Proof:**                Commercial register excerpt          enmodes  GmbH    from June 29, 2022

                                                    **Attachment A 5**

In addition, the defendant is also the managing director of LUNGSHIELD HOLDING Ltd. This company, which is based in Hong Kong, is now the sole

NORDEMANN

Shareholder of enmodes GmbH. Finally, the defendant is also a co-founder of Suzhou Xinqing Medical Technology Co., Ltd (hereinafter: "**magAssist**").

**Proof:** List of shareholders of enmodes GmbH dated 15 Feb-. ruar 2022

**Annex A 5a**

Extract from the Chinese Commercial Register as of January 24, 2022

**Attachment A 6**

Copy of the search of the Zhonglun Law Office incl. certified translation

**Attachment A 7**

It is true that, according to a resident registration inquiry obtained for the purpose of the inspection, the defendant's last registered address is Haßlerstr. 4 in Aachen. However, in the course of the execution of the order of the Cologne Regional Court of
July 4, 2022 in the course of the inspection, it turned out that the defendant actually lives in the meantime at Erzbergerallee 95 in 52066 Aachen.

**Proof:** Residents' registration office information dated 21.06.2022

**Annex A 8**

## II. Know-how of the advertiser

The complainant has been selling so-called heart pumps under the name "Impella" since 2005.

**Proof:** Affidavit Jörg Schumacher of June 30, 2022

**Annex A 9**

Affidavit of Dr.-Ing. Gerd Spanier of June 30, 2022

**Annex A 10**

**NORDEMANN**

Microcardiac pumps such as the "Impella" are used to relieve the heart, for example during difficult or complex heart operations, by pumping blood from the heart chamber into the aorta. In this way, the patient's cardiac output can be supported or temporarily replaced.

**Proof:**     Excerpt website https://www.barbaraklinik.de/unsere-competencies/inner-medicine-i-general-inner-car-diology-high-pressure-laboratory/use-of-micro-heart-pumps.html

                          **Annex A 11**

          Affidavit of Jörg Schumacher from
June 30, 2022, already submitted as **Annex A 9.**

          Affidavit of Dr.-Ing. Gerd Spanier of
June 30, 2022, already submitted as **Annex A 10**

For further explanations of the technology of the advertisers and for further evidence, in particular graphical representations, we refer to our enclosed application note, pp. 9 - 11.

**Evidence:**     Antragschrift vom 01.07.2022 an LG Köln, bereits vor-laid as **attachment A 1**

          Decision LG Cologne, Ref.: 33 O 319/22, dated 04.07.2022

                          **Annex A 12**

          Decision LG Cologne, Az.: 33 OH 3/22, of 04.07.2022

                          **Annex A 13**

The advertiser has considerable know-how and business secrets in the field of artificial heart pumps. It has been researching and developing in the field of insertable active blood pumps as market leader since its foundation in 1981. For the development of the new generation of its blood pumps alone, the Impella ECP, it has invested more than 14 years of development work with its subsidiary, ECP Entwicklungsgesellschaft mbH. Through intensive cooperation, considerable knowledge from Abiomed's Impella division has been incorporated into the development of the ECP and has thus been able to greatly accelerate the speed of development.

NORDEMANN

**Proof**:Affidavit of Jörg Schumacher from
June 30, 2022, already submitted as **Annex A 9.**

Affidavit of Dr.-Ing. Gerd Spanier of
June 30, 2022, already submitted as **Annex A 10**

For further explanations on the know-how of the advertiser and on how the know-how is reflected in the development of the advertiser's development activities, as well as for further evidence, we refer to the application submitted as **Annex A 1,** pp. 12 - 24.

Due to the special field of application of the technology literally in the beating heart of human beings, the smallest details of the technical design are of utmost importance for this technology. In order to achieve a high pumping performance with the smallest possible insertion diameter, high rotational speeds of the pumping system are required. This leads to high so-called shear loads in the pumped blood. Even minimal changes in geometry or deviations from the intended design can have a major influence on the interaction of the blood pump with the blood and lead, for example, to increased blood damage.

**Proof:** Affidavit Jörg Schumacher of
June 30, 2022, already submitted as **Annex A 9.**

Affidavit of Dr.-Ing. Gerd Spanier of
June 30, 2022, already submitted as **Annex A 10**

Accordingly, this area of technology is characterized by a particular density of know-how. Even the smallest differences in the design of blood pumps can have a significant impact when they are used in a person's bloodstream. A malfunction, or even an unknown behavior, of the technology in practical use can threaten human life. This is exemplified by the fact that production employees must first undergo several months of training before they can be deployed in the production of this extremely sensitive technology.

**Proof:** Affidavit Jörg Schumacher of
June 30, 2022, already submitted as **Annex A 9.**

Affidavit of Dr.-Ing. Gerd Spanier of
June 30, 2022, already submitted as **Annex A 10**

At the same time, it is hardly possible to test new developments under real operating conditions, and simulations do not fully take into account the special and sometimes individual operating conditions in the human body. Special know-how is required, for example, in the geometry of the pump rotors, ███████████ ███████████████████, and the position and design of outlet openings.

| | |
|---|---|
| **Proof:** | Affidavit Jörg Schumacher of June 30, 2022, already submitted as **Annex A 9.** |
| | Affidavit of Dr.-Ing. Gerd Spanier of June 30, 2022, already submitted as **Annex A 10** |

The advertiser is the market leader in the field of minimally invasive, actively pumping blood pumps and has already invested over 14 years of development work in the development of the Impella ECP with its subsidiary, ECP Entwicklungsgesellschaft mbH.

| | |
|---|---|
| **Proof:** | Affidavit Jörg Schumacher of June 30, 2022, already submitted as **Annex A 9.** |
| | Affidavit of Dr.-Ing. Gerd Spanier of June 30, 2022, already submitted as **Annex A 10** |

## III.   General measures for the protection of trade secrets

The complainant takes extensive measures to keep its business secrets secret. These include, among other things, the conclusion of strict non-disclosure agreements with employees and third parties, the consistent classification of sensitive data, the training of employees on non-disclosure, and the use of confidentiality measures.
e.g., by means of a so-called employee handbook, the definition of the handling of confidential information within the framework of a "Code of Conduct" and the implementation of strict IT security precautions.

| | |
|---|---|
| **Proof:** | Affidavit Nonna Akopyan dated. 29. June 2022 |

**Annex A 14**

For example, the standard employment contract of the advertiser contains an explicit confidentiality clause and there is a so-called "confidentiality clause".

# NORDEMANN

Employee Handbook with corresponding confidentiality obligations.

**Proof:**     Affidavit Nonna Akopyan dated.
        June 29, 2022, already submitted as **Exhibit A 14.**

Confidentiality agreements are concluded in the case of cooperation with third parties, where an exchange of possibly secret information may occur.

**Proof:**     Affidavit Nonna Akopyan dated.
        June 29, 2022, already submitted as **Exhibit A 14.**

        Consulting Services Agreement dated August 3, 2020

**Annex A 15**

        Certified translation of the Consulting Services Agreement dated August 03, 2020.

**Annex A 16**

        Development & License Agreement of December 1, 2017

**Annex A 17**

Extensive security measures are also taken in the IT area to ensure confidentiality. For example, access to the Abiomed systems (local and remote) is password-protected with corresponding security requirements for the passwords and in some cases using so-called 2-factor authentication. Data is encrypted when transmitted over public networks (including the Internet or VPN/remote access) or on mobile computing devices. Furthermore, users require documented approval from management to access Abiomed systems. For this purpose, the respective managers must fill out a form allowing access to systems and applications before rights are assigned. Access to Abiomed's on-site data centers is restricted and monitored. In addition, there is extensive system monitoring and Abiomed's own internal IT security team plus contracts with industry-leading security vendors.

# NORDEMANN

| | |
|---|---|
| **Proof:** | Affidavit Nonna Akopyan dated.<br>June 29, 2022, already submitted as **Exhibit A 14.** |

Finally, documents containing confidential information are conse- quently marked accordingly with ("Abiomed Confidential").

| | |
|---|---|
| **Proof:** | Affidavit Nonna Akopyan dated.<br>June 29, 2022, already submitted as **Exhibit A 14.** |
| | Kick-off presentation of November 26, 2020 |

**Attachment A 18**

Project report/final report of the 2nd project phase from October 15, 2021

**Annex A 19**

## IV. Cooperation and transfer of trade secrets within the framework of the Consulting Agreement

The advertiser and enmodes GmbH concluded a "Consulting Services Agreement" in 2020.

| | |
|---|---|
| **Evidence:** | Consulting Services Agreement dated August 3, 2020, already submitted as **Annex A 15** |
| | Certified translation of the Consulting Services Agreement dated August 3, 2020, already submitted as **Annex A 16** |

With this agreement, enmodes GmbH was commissioned to provide specific engineering services for the simulation of the Impella ECP (cf. Clause 2 of the Consulting Services Agreement iVm **Exhibit** A ("Statement of Work (SOW)"), **Annex A 15** and **16**). For this purpose, enmodes GmbH received extensive information including detailed digital design models of the technology of the advertiser.

NORDEMANN

**Proof:**                    Affidavit Tino Boelke dated
                              June 30, 2022

                                                            **Annex A 20**

                              Affidavit of Dr.-Ing. Gerd Spanier of
                              June 30, 2022, already submitted as **Annex A 10**

Specifically, this involved, among other things, support services for the development of a new generation of heart pumps, the so-called Impella ECP. The Consulting Service Agreement stipulated a term of four years (see section 3 of the Consulting Services Agreement, **Annexes A 15 and 16)** and the applicability of German law (see section 17 of the Consulting Services Agreement, Annexes **A 15 and 16).**

**Proof:**                    Copy of Consulting Services Agreement dated 3 Au-.
                              gust 2020, already submitted as **Annex A 15**

                              Certified translation of the Consulting Services
                              Agreement dated August 3, 2020, already submitted as
                              **Annex A 16**

According to clause 5, all intellectual property belongs to the advertiser. It says there:

> "*Client shall own and Consultant hereby assigns to Client all Intellectual Property Rights in and to any and all information, ideas, methods, [...] technology, know-how [...] that are conceived, created [...] by Consultant [...].* "

 German:

> "*The Client is the owner of all intellectual property, and the Consultant hereby assigns to it the same, in any and all information, ideas, methods [...] technologies, know-how [...] conceived, created [...] by the Consultant.*"

Extensive know-how (all of the know-how elements described on pages 16 - 24 of the application submitted as **Annex A** 1) has been made available to enmodes GmbH and thus also to the defendant by the complainant.

NORDEMANN

The information was disclosed for the purpose of implementing the Consulting Agreement under a corresponding obligation of confidentiality or arose for the Reporting Party within the scope of the project.

**Proof:**                 Affidavit Tino Boelke dated
                           June 30, 2022, already submitted as **Annex A 20**

                           Affidavit of Dr.-Ing. Gerd Spanier of
                           June 30, 2022, already submitted as **Annex A 10**

For the description of the way in which the documents and business secrets were transmitted to enmodes GmbH and thus also to the defendant, as well as for the further evidence, we refer to the application submitted as **Annex A 1,** pp. 27 - 32.

The Consulting Service Agreement (Annex **A 15 and A 16**) obligates enmo- des GmbH ("Consultant" in the terminology of the Consulting Service Agreement) to maintain comprehensive confidentiality. The relevant clause 7 of the agreement reads as follows:

> *"7 Confidentiality. Consultant acknowledges that technical, scientific, business, legal, strategic and other information received by it directly or indirectly from Client, or developed by Consultant on behalf of Client in con- nection with this Agreement, including, without limitation, the Written Materials (collectively "Confidential Information"), is received or developed by Consultant in confidence, shall not be disclosed to third parties, and is to be used only for the purpose for which it is received or developed. This also applies outside of an executed SOW, when the parties exchange information in contemplating and discussing services or other activities to be performed in the future. Consultant shall exer- cise the same degree of care, however not less than reasonable care, in protecting such information from disclosure as it exercises with its own proprietary information. The restrictions on the use or disclosure of Confidential Information shall not apply to any information that: (i) is independently developed by Consultant prior to the time of disclosure; (ii) is in the public domain without breach of this Agreement and through no fault of Consultant; (iii) was at the time of disclosure to Consultant properly known to Consultant free of restriction or lawfully*

NORDEMANN

*received free of restriction from another source having the right to so furnish such information: (iv) Client agrees in writing is free of such restrictions; and/or (v) is required by law, court order or a governmental agency to be disclosed, in which case Consultant shall give Client reasonable notice of such disclo- sure, shall reasonably assist the Client as requested by Client, in protecting such information from disclosure, and shall disclose only such information to such third parties as it is ulti- mately required by law, court order or a governmental agency to do."*

German:

*"7 Confidentiality. The Consultant acknowledges that the technical, scientific, business, legal, strategic and other information provided to it di- rectly or indirectly by the Client or developed by the Consultant on behalf of the Client under this Agreement, including in particular the written material (collectively referred to as the "Confidential Information" ) shall be received or developed by the Consultant as confidential, shall not be disclosed to third parties and shall be used exclusively for the purposes for which it was received or developed. This also applies outside of a signed LBS when the parties exchange information during mutual coordination and discussions about possible future services or other activities. The restriction on the use or disclosure of confidential information does not apply to information that is (i) by the Adviser prior to the date of disclosure un-*
*(ii) are publicly available without breach of this Agreement and through no fault of the Consultant; (iii) were already lawfully available to the Consultant at the time of provision by the Client without disclosure restrictions or were lawfully disclosed to the Consultant by another source authorized to disclose the information without disclosure restrictions; are free of disclosure restrictions as evidenced by written confirmation by the Client; and/or are available to the Consultant without disclosure restrictions as a result of legal requirements or the Client's fault.*

**NORDEMANN**

*court or governmental order, in which case the contracting agency must provide reasonable notice of the disclosure to the contracting party, must provide reasonable assistance to the contracting agency in protecting such information from disclosure upon request by the contracting agency, and may disclose information to third parties only to the extent ultimately required by law, court or governmental order."*

**Evidence:**              Consulting Services Agreement dated August 3, 2020, already submitted as **Annex A 15**

                          Certified translation of the Consulting Services Agreement dated August 3, 2020, already submitted as **Annex A 16**

In addition, the Consulting Service Agreement refers to ▇▇ ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ , ▇▇▇▇▇▇▇▇▇▇▇▇▇ a comprehensive set of rules that are customary in the industry and obligate the parties to maintain confidentiality.

**Evidence**:              Copy of the Non-Disclosure Agreement dated May 2016 incl. certified translation.

                                                          **A 21 plant volume**

In addition, an even broader ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ .

   **Evidence:**              Copy of non-disclosure agreement dated May 2021. incl. certified translation, already submitted as **Plant volume 21**

Therefore, secrecy of the know-how and secrets of the advertiser was ensured. The protected know-how and business secrets could neither be generally known to the relevant circles of experts nor become accessible without further ado.

NORDEMANN

| | |
|---|---|
| **Evidence:** | Consulting Services Agreement dated August 3, 2020, already submitted as **Annex A 15** |
| | Certified translation of the Consulting Services Agreement dated August 3, 2020, already submitted as **Annex A 16** |
| | Affidavit of Jörg Schumacher from June 30, 2022, already submitted as **Annex A 9.** |
| | Affidavit of Dr.-Ing. Gerd Spanier of June 30, 2022, already submitted as **Annex A 10** |

Within the framework of the cooperation between the complainant and enmodes GmbH, the defendant also obtained knowledge of the extensive information including detailed digital construction models of the complainant's technology and thus also of the trade secrets.

As the managing director of enmodes GmbH, he had direct access to the documents of the complainant. The defendant had a key role in the cooperation between enmodes GmbH and the advertiser. According to the Consulting Services Agreement section 3 paragraph 5, the advertiser had a special right of termination if the defendant left the company enmodes GmbH. In the event of the departure of Dr. Ralf Borchard, Dr. Fiete Böhning or Dr. Sascha Groß-Hardt, enmodes GmbH was obliged to provide other suitable persons for the project.

Literally, it states:

> *"Client may immediately terminate this Agreement upon written notice to Consultant in case that Dr. Kim Kaufmann ceases to be an employee of Consultant. In case that Dr. Ralf Borchardt, Dr. Fiete Böhning, or Dr. Sasha Groß-Hardt cease to be employees of Consultant, Consultant is obligated to pro- vide adequate replacement."*

And in the German translation:

> *Should Dr. Tim Kaufmann leave the consultant, the client may terminate the present contract according to*

**NORDEMANN**

> *The consultant shall be entitled to terminate the employment of Dr. Ralf Borchardt or Dr. Sascha Groß-Hardt. Should Dr. Ralf Borchardt, Dr. Fiete Böhning or Dr. Sascha Groß-Hardt leave the Consultant, the Consultant shall provide for an adequate replacement.*

It is clear from this circumstance that the cooperation was significantly tailored to the participation of the defendant and that the defendant necessarily had to be granted unrestricted access to the transmitted business information of the complainant for the cooperation.

**V.** **Chinese patent and utility model applications with know-how of the advertiser**

On May 9, 2022, the complainant learned that numerous patent and utility model applications had been disclosed in China, which - as it later turned out - contained a large amount of know-how of the complainant that it had shared with enmodes GmbH.

| **Proof:** | Affidavit Nonna Akopyan dated. June 29, 2022, already submitted as **Exhibit A 14.** |
| | |
| | Affidavit           Affidavit           Roland   Müller   from June 30, 2022 |
| | **Annex A 22** |
| | Affidavit of Jörg Schumacher from June 30, 2022, already submitted as **Annex A 9.** |
| | Affidavit of Dr.-Ing. Gerd Spanier of June 30, 2022, already submitted as **Annex A 10** |

Specifically, this includes the following applications:

- CN113856036A
- CN114010937A
- CN114129890A
- CN114344702A
- CN114522338A
- CN215135915U

# NORDEMANN

- CN216061676U
- CN216439825U
- CN216439826U

**Proof:**                Affidavit         Affidavit      Roland   Müller   from
                         June 30, 2022, already submitted as **Exhibit A 22.**

                         Chinese patent and utility model applications in English
                         translation

                                                  **Plant volume A 23**

What is already strange about the publications of this patent and utility model
application is that both the utility models and the patent applications were
published close to each other, even though the filing times were close to each
other. This is unusual, since utility models are usually published much faster than
patent applications, which are typically not published until 18 months after the
filing or priority date. The fact that the publications were made close to each other
therefore indicates that the patent applications were requested for early
disclosure.

**Proof:**                Affidavit         Affidavit      Roland   Müller   from
                         June 30, 2022, already submitted as **Exhibit A 22.**

A review of the listed Chinese patent and utility model application in dates on
June 15/16, 2022 has shown that it contains extensive technical knowledge of the
advertiser, which the advertiser had shared with enmodes GmbH in the context of
the consulting agreement.

**Proof:**                Affidavit         Affidavit      Roland   Müller   from
                         June 30, 2022, already submitted as **Exhibit A 22.**

                         Affidavit of Jörg Schumacher from
                         June 30, 2022, already submitted as **Annex A 9.**

                         Affidavit of Dr.-Ing. Gerd Spanier of
                         June 30, 2022, already submitted as **Annex A 10**

For a more detailed description of the extent to which the know-how of the
advertiser is reflected in the patent and utility model applications, we refer to the
application submitted as **Annex A 1**, p. 37 a. E. - 44. E. - 44.

**NORDEMANN**

**VI.    Applicant of the patents: magAssist (co-founded by the defendant)**

The applicant for the patents is a company named Suzhou Xinqing Medical Techno- logy Co., Ltd; hereinafter: "magAssist"). The defendant is one of the founders of the company magAssist - as already stated in section A. I. 2. The other founders are Dr. Xu Boling and Dr. Ulrich Steinseifer.

This was the result of research commissioned by the advertiser into the background of magAssist by a respected, Chinese, globally active law firm with over 360 partners (Zhong Lun; http://www.zhong- lun.com).

**Proof:**                                Excerpt from the English version of the homepage of the Zhonglun Law Office, www.zhonglun.com incl. Deepl translation

**Annex A 24**

Copy of the research of the law firm Zhonglun incl. certified translation, already submitted as **Annex A 7**

As further evidence that the defendant is one of the founders of the company magAssist, we refer to the application documents 46 - 53 submitted as **Annex A 1.**

Furthermore, the complainant had to realize that the magAssisst openly orientates itself towards the complainant and establishes connections to its technology. In its own statements, it refers to the advertiser and its success in the USA and Europe and makes clear that it wants to achieve the same in the Chinese market. We attach a certified translation of an article dated January 13, 2021, which also describes the direct competitive relationship between the advertiser and magAssist. In addition, we are attaching further corresponding reports on Chinese websites with a deepl translation.

**Proof**:                                Printout                    of the                    Website https://mp.wexin.qq.com/s/jKft3l_FcVmqImCcUrdCvw incl. accompanying translation

**Annex A 25**

**NORDEMANN**

Expression of the Website https://mp.wei-xin.qq.com/s/oVLjsumUzScx7F7Mf-GzXA incl. deepl-translation

**Annex A 26**

Excerpt from the website https://www.magas-sist.com.cn/company/134.html with press release dated October 18, 2021 incl. deepl translation

**Annex A 27**

Excerpt from the website https://mp.wei-xin.qq.comsiSKr97JfCS55rbgheCJahg as of November 1, 2021 incl. deepl translation

**Annex A 28**

Zhonglun Law Firm's research eventually revealed that the accused was personally centrally involved in product development at magAssist. This is what the report says on page 4:

> "Ulrich Steinseifer and Tim Kaufmann are cofounders of magAssist, Kaufmann is deeply involved in the flow channel de- sign and optimization of magAssist's products. Enmodes pro- vided complete computing resources for magAssist and com- pleted the first round of fluid mechanics' design. At the same time, Enmodes also established parallel computing resources for magAssist, trained professional engineers, and assisted in building a fluid mechanics experimental platform."

German:

> "Ulrich Steinseifer and Tim Kaufmann co-founded ma-gAssist, Kaufmann is heavily involved in the design of the flow channel and the optimization Of magAssist products. Enmodes provided all the computational capacity for magAssist and completed the first round of fluid mechanics design. At the same time, modes En- modes provided parallel computational resources for magAssist, trained Professional Engineers [author′s note: trained

NORDEMANN

*Engineers] continued and supported the development of an experi- mental platform for fluid mechanics."*

| | |
|---|---|
| **Evidence:** | Copy of the report of the law firm Zhonglun incl. beglau-. bigter translation, p. 4, already submitted as **Annex A 7** |
| | Printout of the website https://mp.wei- xin.qq.com/s/0Lek8cIZngnaDVl_FUF2dQ incl. beglau- bigter translation (article dated July 17, 2020). |

**Annex A 29**

The law firm refers to the following website reports (identical in content):

- https://www.sohu.com/a/408097691_133140?_f=index_betapagehot- news_4&_trans_=000014_bdss_dkzcbj und

- https://mp.weixin.qq.com/s/0Lek8cIZngnaDVl_FUF2dQ

It states:

> *"**Dr. Tim Kaufmann**, another co-founder of magAs- sist, **has** world-leading computational fluid dynamics technologies for the cardiovascular system, **founded the enmodes computational fluid dynamics company,** and has been involved in multiple NIH projects evaluating the flow mecha- nics of artificial hearts. **Dr. Kaufmann was instrumental in designing and optimizing the flow paths for magAssist's products, and enmodes provided magAssist with complete computational resources to complete the first phase of the fluid mechanics design. At the same time, enmodes built parallel computing resources for magAssist, trained expert engineers, and helped build a fluid mechanical test platform."***

(emphasis by author)

19 / 34

**NORDEMANN**

**Proof:**                       Printout of the website https://mp.wei-xin.qq.com/s/0Lek8clZngnaDVl_FUF2dQ incl. beglaubigter translation (article dated July 17, 2020), already submitted as **Exhibit A 29.**

## VII.  Interlocking of the defendant with the patent applicant

The defendant is personally and economically connected with the patent applicant (ma- gAssist).

First of all, the defendant is co-founder of the patent applicant magAssist. This company was founded in 2017 by Dr. Xu Boling, Dr. Tim Kaufmann and Dr. Ulrich Steinseifer. Furthermore, there is a close personal relationship between the founders/managing director of enmodes GmbH and Dr. Boling, the third founder of magAssist.

The close personal relationship between Dr. Boling, Dr. Kaufmann and Dr. Steinseifer is also shown by the following pictures and results of the research of the law firm Zhonglun (p.6):



Dr. Boling (first from left) and Dr. Steinseifer (second from left) at
the Mechanical Circulation Forum in Suzhou.
(published in the official channel of magAssist https://mp.weixin.qq.com/s/MnUp-kox9p3qZ5LcGMilh_g )

NORDEMANN



心擎医疗创始人徐博翎博士与共同创始人Tim Kaufmann教授讨论体外人工心脏的研发

Dr. Boling and Dr. Kaufmann

(published at; https://mp.weixin.qq.com/s/WudMRu0hvOjUKMLn7jkYhQ;

Text below image: "Dr. Boling, founder of magAssist, discusses the development of an extra-corporeal artificial heart with co-founder Professor Tim Kaufmann."

**Proof:**               Copy of the search of the law firm Zhonglun incl. beglau-. bigter translation, already submitted as **Annex A 7**

Printout of the website https://mp.wei-xin.qq.com/s/MnUpkox9p3qZ5LcGMilh_g incl. Deepl-translation

**Annex A 30**

Printout of the website https://mp.wei-xin.qq.com/s/WudMRu0hvOjUKMLn7jkYhQ incl. Deepl- translation

**Annex A 31**

Please note that the translation software translates the company magAssist as "*HeartRock Medical*" or "*Heartbeat Medical*". However, this is the same company that translates into Chinese.

character is: 心擎医疗.

NORDEMANN

**Proof:**                          Isolated Deepl translation of 心擎医疗 as "Heart-. beat Medical"

**Annex A 32**

Deepl      translation      of      https://mp.wei-xin.qq.com/s/WudMRu0hvOjUKMLn7jkYhQ      with transliteration of心擎医疗 as "HeartRock Medical."

**Annex A 33**

Confirmation of Attorney Ping Gu (Partner of Zhonglun Law Firm) by email dated July 1, 2022, that all the three translations of 心擎医疗 are possible

**Annex A 34**

Extract of Chinese patent application CN 114010937A with certified German translation (marked)

**Annex A 35**

Certified translation of 心擎医疗 as magAssist on page https://mp.wei-xin.qq.com/s/jKft3l_FcVmqImCcUrdCvw (marked)

**Annex A 36**

Finally, the research of the law firm Zhonglun also revealed that enmodes GmbH had provided comprehensive engineering and technical services to magAssist (see in particular article dated July 17, 2020, Exhibit A 29). In addition, Dr. Kaufmann personally was apparently centrally involved in product development at magAssist. This is stated in the report on page 4:

> *"Ulrich Steinseifer and Tim Kaufmann are cofounders of magAssist, Kaufmann is deeply involved in the flow channel de- sign and optimization of magAssist's products. Enmodes pro- vided complete computing resources for magAssist and com- pleted the first round of fluid mechanics' design. At the same time, Enmodes also established parallel computing resources*

22 / 34

**NORDEMANN**

*for magAssist, trained professional engineers, and assisted
in building a fluid mechanics experimental platform."*

German:

*"Ulrich Steinseifer and Tim Kaufmann co-founded ma-
gAssist, Kaufmann is heavily involved in the design of the
flow channel and the optimization Of magAssist products.
Enmodes provided all the computational capacity for
magAssist and completed the first round of fluid mechanics
design. At the same time, modes En- modes provided
parallel computational resources for magAssist, trained
Professional Engineers, and supported the development of
an experimental platform for fluid mechanics."*

**Evidence:**          Copy of the report of the law firm Zhonglun incl. beglau-.
                       bigter translation, p. 4, already submitted as **Annex A
                       7**

                       Printout of the website https://mp.wei-
                       xin.qq.com/s/0Lek8cIZngnaDVI_FUF2dQ incl. beglau-
                       bigter translation (article dated July 17, 2020), already
                       submitted as **Annex A 29**

For details on the connection between magAssist and the accused, please refer
to pages 45 - 57 of the application submitted as **Exhibit A 1** with numerous
additional references.

## VIII.  Patent applicant aligns with advertiser and is direct competitor

Furthermore, the advertiser had to realize that the magAssisst quite openly
orientates itself towards it and establishes connections to its technology. In its
own statements, it refers to the advertiser and its success in the USA and Europe
and makes clear that it wants to achieve the same in the Chinese market. We
attach a certified translation of an article from the
January 13, 2021, which also describes the direct competitive relationship of the
advertiser and magAssist and is titled "magAssist, the pioneer for Chinese
production of artificial hearts and lungs orients itself to the innovative American
stock market giant ABIOMED." Supplementary we add

# NORDEMANN

other corresponding reports on Chinese websites with Deepl translation.

**Proof:**                     Printout                of the                Website
https://mp.wexin.qq.com/s/jKft3I_FcVmqImCcUrdCvw
incl. accompanying translation already submitted as
**A n n e x  A 36**

Printout of the website https://mp.wei-
xin.qq.com/s/oVLjsumUzScx7F7Mf-GzXA incl.
deepl- translation, already submitted as **attachment
A 26**

Excerpt from the website https://www.magas-
sist.com.cn/company/134.html with press release
dated October 18, 2021 incl deepl translation already
submitted as **Annex A 27**

Excerpt from the website https://mp.wei-
xin.qq.comsiSKr97JfCS55rbgheCJahg dated Novem-
ber 1, 2021 incl deepl translation, already submitted as
**Exhibit A 28.**

This is also in line with the "Made in China 2025" campaign. "Made in China
2025" is a May 2015 strategic plan by Chinese Premier Li Keqiang and the
Chinese State Council, described by the Center for Strategic and International
Studies as an "initiative to comprehensively upgrade China's industry" directly
inspired by Germany's Industrie 4.0. It is an attempt to bring the country's
manufacturing into the value chain. Goals include increasing the domestic share
of core materials to 40% by 2020 and 70% by 2025, and the plan targets high-
tech sectors, including the pharmaceutical industry. High-performance medical
devices, such as the heart pump at issue in this case, also belong to a key
industry. The fact that the heart pump at issue is such a high-performance
medical device is also evidenced by the attached interview with Fraunhofer IPK
by Dirk Michels, Vice President Global Manufacturing & Supply Chain and
Managing Director of the advertiser, entitled "Hightech Engineering für's Herz".

**Proof:**                     Printout of Wikipedia article "Made in China 2025".

**Annex A 37**

NORDEMANN

Copy of an interview by Dirk Michels, Vice President Global Manufacturing & Supply Chain and Managing Di- rector, of the advertiser with Fraunhofer IPK entitled "Hightech Engineering for the Heart".

**Annex A 38**

The following picture shows how far magAssist has come with the construction of the heart pump. It shows a heart pump very similar to the Impella heart pump (emphasis on this side):

  



## IX. Accused already announces development of Impella-like pumps for Chinese investors

In this context, it can now also be explained that the defendant announced to the Managing Director of Abiomed Europe GmbH and Vice President and Chief Technology Officer of Abiomed Inc., Dr. Thorsten Sieß, that he wanted to develop Impella-like pumps for Chinese investors.

As late as May 2020, the defendant had assured the applicant in an e-mail prior to the conclusion of the Consulting Services Agreement that he would not offer any services related to minimally invasive heart pumps to third parties:

> *"That being said, it is anyway not our intention to provide ser-vice for another catheter-based pump company. That's not who we are and that is not what our work ethic is. We are with Abiomed on this. We commit to this partnership and we un- derstand your need to protect yourself."*

German:

> *"That being said, it is not our intention to provide services to another company that manufactures pumps for catheters anyway. That's not who we are, and that's not in line with our work ethic. We are on the side of Abiomed. We're committed to this partnership, and we understand your need to protect yourself."*

**Evidence:**             Email from Dr. Kaufmann dated May 13, 2020.

**Annex A 39**

The defendant then signed the corresponding Consulting Services Agreement on July 30, 2020. As the complainant was now able to find out, the defendant had co-founded the company magAssist only a short time before, as can be seen from a press release dated July 17, 2020 - i.e. a few days before the signing of the Consulting Services Agreement.

Evidence:                Printout     of     website     https://mp.wei-xin.qq.com/s/0Lek8cIZngnaDVI_FUF2dQ       incl. certified translation (article dated July 17, 2020), already submitted as **Exhibit A 29.**

Only in conversations at the beginning and end of May 2022 with Dr. Sieß did the defendant now express himself accordingly as follows:

In a first meeting on May 6, 2022, the defendant stated that he had Chinese investors who were urging him to develop blood pumps similar to Abiomed's Impella pumps for the Chinese market. He said he had not yet made up his mind, but he did not know how he could refuse this request.

In the second meeting on May 20, 2022, he informed Dr. Sieß that he had come to the conclusion that he would accept the Chinese investors' request to

# NORDEMANN

"could not refuse" and that he would therefore develop the Impella-like pump for the Chi- nese investors.

<blockquote>
<strong>Evidence:</strong>            Affidavit of Dr. Thorsten Sieß from 28.June 2022
</blockquote>

<strong>Annex A 40</strong>

## X.    Transfer of enmodes GmbH to Chinese "Lungshield Holding Ltd."

Finally, the complainant became aware that the company shares of enmodes GmbH were completely transferred to the Chinese holding company Lungshield Hol- ding Ltd., which is registered in the company register of Hong Kong, at the beginning of this year.

**Proof:**                List of shareholders enmodes GmbH dated February 15 2022, already submitted as **Annex A 6**

According to the extract from the commercial register of Lungshield Holding Ltd, the defendant is now also the managing director of this Chinese holding company.

**Proof:**                Commercial register extract (HK) for Lungshield Holding Ltd. from 28 January 2022

<strong>Annex A 41</strong>

Lungshield Holding Ltd. was established in 2018 and is in turn the principal shareholder of Lungshield Medical (Suzhou) LLC, which was also established in 2018.

**Proof:**                Copy of the search of the law firm Zhonglun incl. beglau-. bigter translation, already submitted as **Annex A 7**

In the meantime, the law firm Zhonglun, which was commissioned by the complainant, has been able to ascertain further evidence in supplementary research that LHield Medical (Suzhou) is working on a copy of the complainant's Impella heart pump.

**Proof:**                Copy of the law firm's supplemental search report. Zhonglun

**NORDEMANN**

**Annex A 42**

An overview of the defendant's identified links with the various Chinese companies is shown below:



Presentation of the identified relationships from the research of the
law firm Zhonglun (p. 8), already submitted as Annex A 7

## XI. Civil visit already made to enmodes GmbH and the defendant on July 11, 2022.

In order to enforce civil claims against enmodes GmbH and the defendant, the complainant has already applied to the Cologne Regional Court for an inspection of the business premises of enmodes GmbH and the private premises of the defendant in a combined independent procedure for taking evidence and interim injunction proceedings in accordance with the so-called "Düsseldorf inspection practice" (application already submitted as **Annex A 1**).

**Evidence:**　　　　　　　Application already submitted as **Exhibit A 1**

The Cologne Regional Court granted the inspection request in full in its decisions of July 4, 2022.

**NORDEMANN**

**Evidence:**             Decisions of the Regional Court of Cologne dated July 4, 2022,
already pre-

laid out as **Annexes A 12 and A 13**

The inspection then took place on July 11, 2022. The results of the experts from the inspection are not yet available. The court regularly decides on the transmission of the findings obtained through access to the business premises of en- modes GmbH and the private premises of the defendant only after the inspection has been completed in a subsequent proceeding.

In general, we would like to point out that the civil law inspection procedure was in principle narrower and, in the context of the decision of the Regional Court of Cologne, only tailored to the disclosure and use of technical findings relating to rotor design, ██████████ or discharge tube design, including analysis results, design data and design recommendations for the heart pumps as the object of the inspection. In particular, the interconnections of the defendant with the companies "Lungshield Holding Ltd." and "Lungshield Medical (Suzhou) LLC" were not yet an explicit subject of the civil law inspection proceedings.

**Evidence:**             Decisions of the Regional Court of Cologne dated July 4, 2022,
already pre-

laid out as **Annexes A 12 and A 13**

## B.   Criminal evaluation

For the legal assessment we only allow ourselves the following comments:

Based on what has happened and the defendant's conduct, the complainant must assume that the defendant has violated Section 23 (3) GeschGehG and has used or disclosed a trade secret, which is a secret document or rule of a technical nature entrusted to him in the course of business, in order to promote his own or another's competition or for his own benefit, in any case contrary to Section 4 (2) No. 3 GeschGehG.

**NORDEMANN**

I.    **Business secrets pursuant to § 2 No. 1 GeschGehG**

The technical knowledge mentioned above and described in the application on p. 15 - 24 are trade secrets within the meaning of the GeschGehG of the advertiser, which is at the same time a regulation of a technical nature.

According to § 2 No. 1 GeschGehG, business secrets are information of economic value that is neither generally known nor readily available to persons in the circles that normally handle this type of information, that is the subject of appropriate secrecy measures and for which there is a legitimate interest in secrecy.

The findings regarding various design details of Impella pumps are information of considerable economic value. This is demonstrated by the extensive research and development work carried out over decades, the size and attractiveness of the market for heart pumps, and the extensive international patent applications in this field alone.

These trade secrets are the subject of confidentiality measures by the rightful owner that are appropriate under the circumstances,
§ 2 No. 1 lit. b) GeschGehG.

Secrecy measures are all precautions to protect the secret information from unlawful acquisition, use or disclosure. Company-specific protection concepts and protection strategies and structured trade secret management are required (Köhler/Bornkamm/Fedder- sen/Alexander, 40th ed. 2022, GeschGehG § 2 marginal no. 53).

The complainant has complied with strict confidentiality measures by, among other things, only disclosing potentially sensitive information on the basis of a confidentiality agreement, consistently marking the relevant information exchanged as confidential and having a comprehensive IT security concept. The information and know-how are classified and marked as trade secrets. The IP compliance management of the advertiser provides for protective measures in the personnel, legal and technical areas. The employment contracts of the advertiser contain confidentiality clauses and, in addition, employees are bound to confidentiality by the "Employee Handbook". Cooperation with outsiders only takes place under the condition of confidentiality agreements, such as the submitted Consulting Service Agreement and the De- velopment & License Agreement. The IT areas are protected by passwords, 2-

**NORDEMANN**

Factor authentication, VPN networks that keep data on protected servers, access management and restricted access to IT assets.

Therefore, their proprietary knowledge was neither readily accessible nor generally known. The legitimate interest in secrecy in this case already results from the secrecy itself and the corresponding economic significance of a loss (Harte-Bavendamm/Ohly/Kalbfus, Ge- schGehG, 1st edition 2020, § 2 marginal no. 66 with further references).

II.   **Violation of the prohibition of disclosure pursuant to Sec. 4 (2) No. 3 GeschGehG**

The complainant is convinced that the defendant must have disclosed her trade secrets to magAssist and/or other third parties such as Lungshield Holding Ltd. without authorization.

From the point of view of the complainant, it is predominantly probable that there has been a violation of its trade secrets pursuant to Section 4 (2) (3) GeschGehG, since there is strong evidence that the defendants have disclosed and used the complainant's trade secrets and in doing so have violated obligations not to disclose these trade secrets.

This results from the fact that central trade secrets, which could only have been known to the respondents on the basis of the consulting project, were incorporated in numerous Chinese patent and utility model applications. Specific findings, for example on the rotor design (so-called tangential rotor) and on the ███████████████████████████████████ were disclosed to the defendants at the beginning of the consulting project under strict confidentiality obligation for the purpose of project implementation. Further findings, such as the advantageousness of a particularly short casing shell, had arisen specifically within the scope of the project and had been assigned to the notifying party in accordance with item 5 of the consulting agreement.

It is almost impossible that exactly these design elements in such a specific field of development as that of minimally invasive heart pumps could have been included in the Chinese patent and utility model applications without knowledge of the trade secrets of the applicant. Rather, it is overwhelmingly likely that this was communicated through the close personal and economic ties of the defendants with the applicant of these property rights.

**NORDEMANN**

Such a communication violates Clause 7 of the Consulting Agreement and therefore constitutes an unauthorized disclosure of a trade secret of the respondent pursuant to Sec. 4 (2) No. 3 GeschGehG. Moreover, due to the close economic ties between the defendant and the applicant, it is probable that the trade secrets were also exploited commercially, i.e. also used. This is also suggested by the statements of the defendant re II, to develop Impella-like pumps for Chinese investors.

### III.   Further requirements of § 23 (3) GeschGehG

Finally, the trade secrets in question constitute suitable objects of crime pursuant to Sec. 23 (3) GeschGehG, and the defendant may also have acted to promote his own and others' competition or out of self-interest by disclosing them.

The trade secrets in question meet the requirements of an object of crime within the meaning of Sec. 23 (3) GeschGehG.

Regulations of a technical nature are instructions, directions, teachings or other structured specifications aimed at setting a technical process in motion, controlling and/or influencing its course (Köhler/Bornkamm/Feddersen/Alexander, 40th ed. 2022, GeschGehG § 23 marginal no. 64). The concept of templates includes, in particular, drawings, models, templates, patterns, prototypes and the like (Köhler/Bornkamm/Feddersen/Alexander, 40. Aufl. 2022, GeschGehG § 23 Rn. 62), i.e. everything that serves as a model in the production of new items.

In the present case, trade secrets in the form of design models and specific findings on rotor design, ████████████████████, design of the discharge hose were passed on to the defendant. These technical findings were incorporated in patent and utility model applications. Technical teachings embodied in patents are the classic case for a regulation of a technical nature and are thus excluded from the
§ Section 23 (3) GeschGehG includes.

The defendant acted to promote his own or third party competition and for his own benefit.

Acting to promote one's own or another's competition is given if the perpetrator, by the act constituting the offense, improves the

NORDEMANN

competitive position or the competitive position of a third party. This includes both the pursuit of a current advantage and the improvement of future competition. The perpetrator acts for his own benefit if he strives for his own material or immaterial advantages by committing the act (Köhler/Bornkamm/Feddersen/Alexander, 40th ed. 2022, GeschGehG § 23 Rn. 43 f.).

Through his close personal and economic ties to the companies magAssist and Lungshield Holding Ltd., he himself profits from the use and disclosure of the trade secrets. This is because by registering the intellectual property rights and granting them, magAssist obtains exclusive rights that monopolize the economic exploitation of the defendants' know-how for the Chinese market. Even if the given economic and personal connections with magAssist did not exist, magAssist is in any case a third party within the meaning of Section 23 (3) GeschGehG. In any case, the defendant also acted to promote the competition of magAssist.

## IV.   Public interest in prosecution

There is a public interest in criminal prosecution. With regard to No. 261 of the Code of Criminal Procedure (RiStBV), the focus must be on the enrichment sought by the accused, which was to be achieved through the use of the know-how for the registration of industrial property rights with the intention of making a profit.

## V.   In the alternative: Criminal complaint

In any case, however, the criminal complaint was filed in due form and time. §§ Sections 23 (8), 77b StGB. As the owner of the trade secrets, the complainant is entitled to file the application. She learned of the patent and utility model applications on May 9, 2022. However, she only learned later, when the Chinese patent application was examined on June 15/16, 2022, that the application for the industrial property rights was based on the unauthorizedly obtained trade secrets of the complainant.

## VI.   Other parties involved

In view of the defendant's non-transparent connections with enmo- des GmbH, magAssist and Lungshield Holding, it is to be feared that further, as yet unknown perpetrators or participants were involved in the crimes. Further participants could also be in the company enmodes GmbH or the Lungshield

**NORDEMANN**

Holding Ltd. or be involved in it. It is also conceivable that the two other founders of the company magAssist, namely Ms. Xu Bo- ling and Dr. Ulrich Steinseifer, have made themselves liable to prosecution, Sec. 23 (2) Gesch- GehG.

## C.   Conclusion and suggestion of criminal procedural measures.

As can be seen from the above, there is a high probability that the defendant violated trade secrets of the complainant and therefore committed a criminal offense.

It is therefore suggested that investigative measures be taken to secure evidence of such a more punishable trade secret violation. It would be conceivable to search the business premises of enmodes GmbH, where the accused is managing director, but also the private premises of the accused himself. In particular, the seizure of the following documents in ana- logic and/or digital form seems promising:

-   Documents and communication records relating to the know-how of the applicant, such as e-mail correspondence, letters, interview transcripts, digitally transmitted files, contracts;

-   Documents and communications related to the accused's entanglements with Chinese companies, in particular the company LUNGSHIELD HOLDING Ltd;

-   Design data, models, measurement results in the laboratory premises of enmodes GmbH.

NORDEMANN

Prof. Dr. Christian Czychowski          i.V.     Dipl. Wirt. Ing. Sebastian Dworschak
Lawyer                                            Lawyer

*Qualified electronically signed*