## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ABIOMED, INC. and ABIOMED EUROPE, GmbH, | ) ) ) ) |  |
| Plaintiffs | ) ) |  |
| v. | ) ) | Case No. 23-cv-10087-DJC |
| ENMODES GmbH and TIM KAUFMANN, | ) ) | **UNDER SEAL** |
| Defendants. | ) ) ) ) |  |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                   **September 22, 2023**

## I.      Introduction

Plaintiffs Abiomed, Inc. ("Abiomed USA") and Abiomed Europe GmbH ("Abiomed Europe") (collectively, "Abiomed") have filed this lawsuit against Defendants Enmodes GmbH (Enmodes) and Tim Kaufmann ("Kaufmann") (collectively, "Defendants"), alleging breaches of contract (Counts I-III), state and federal trade secret misappropriation (Counts IV-V), misappropriation of confidential business information (Count VI), fraudulent inducement (Count VII) and unjust enrichment (Count VIII).  D. 17-1.  Defendants now move to dismiss for lack of jurisdiction and under the doctrine of *forum non conveniens*.  D. 20.  Abiomed opposes the motion and moves for limited jurisdictional discovery, D. 27.  For the reasons stated below, the Court DENIES the motion to dismiss and DENIES the motion for jurisdictional discovery as moot.

## II.      Standard of Review

When ruling on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, a district court applies the *prima facie* standard of review.  United States v.

Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001) (citation omitted).  "Under this standard, it is plaintiff's burden to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution."  Id. (citation omitted).  The Court considers the facts alleged in the pleadings as well as the parties' supplemental filings. Sawtelle v. Farrell, 70 F.3d 1381, 1385 (1st Cir. 1995) (citing cases); Ticketmaster-N.Y. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).  The Court will "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim."  Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998) (citation omitted).  But it will "not credit conclusory allegations or draw farfetched inferences."  Ticketmaster-N.Y., 26 F.3d at 203.  The plaintiff needs to "do more than simply surmise the existence of a favorable factual scenario; he must verify the facts alleged through materials of evidentiary quality."  Killion v. Commonwealth Yachts, 421 F. Supp. 2d 246, 252 (D. Mass. 2006) (internal citation omitted).  The Court also "add[s] to the mix facts put forward by the defendants, to the extent that they are uncontradicted."  Mass. Sch. of L., 142 F.3d at 34 (citation omitted).

## III.    Factual Background

The Court draws the following factual allegations from Plaintiffs' complaint, D. 17-1, as well as exhibits to the parties' filings on the motion to dismiss, D. 21, D. 26, D. 40, D. 44, D. 53.[1]

Abiomed USA is a corporation organized under Delaware law and headquartered in Danvers, Massachusetts.  D. 17-1 ¶ 7.  Abiomed USA wholly owns Abiomed Europe, a limited liability company organized under German law and headquartered in Aachen, Germany.  Id. ¶ 9;

---

[1] As noted, on a motion to dismiss under Fed. R. Civ. P. 12(b)(2), the parties and the Court may "go beyond the pleadings" to evaluate whether the prima facie standard has been satisfied.  Swiss Am. Bank, 274 F.3d at 619 (citation omitted); see Sawtelle, 70 F.3d at 1385.

D. 26-6 ¶¶ 5–6.  Abiomed develops and sells medical devices for cardiac and respiratory support, including a line of heart pumps under the brand name Impella.  D. 17-1 ¶¶ 17–18.  Abiomed is currently researching and developing its next generation of heart pumps, referred to as the Impella ECP.  Id. ¶ 39.  Abiomed's platform lead for the Impella ECP project, Ralph D'Ambrosio, and a team of engineers are located in Danvers, Massachusetts.  Id. ¶¶ 43, 117.  The Massachusetts team oversees research and development conducted by Abiomed's engineers in Germany.  Id. ¶¶ 25, 44.

Enmodes is a "small German engineering firm" in Aachen, Germany managed and co-founded by Kaufmann, who also lives there.  Id. ¶¶ 3, 9-10.  "Enmodes provides design and engineering services in the medical device field," including "computation analyses and numerical simulations."  Id. ¶ 49.  Enmodes was also developing "a respiratory assist technology that would mimic the elasticity . . . of the lungs" called RasQ.  Id. ¶ 51.  RasQ is a type of extra corporeal membrane oxygenation ("ECMO") device, which oxygenates a patient's blood outside the body in an artificial lung.  Id. ¶ 50.

A.    The Parties' Pre-Existing Contractual Relationship

At some point between 2011 and 2016, Kaufmann, who was Enmodes's CEO, approached Thorstein Siess ("Siess"), Abiomed USA and Abiomed Europe's Chief Technology Officer, about a possible collaboration between their companies.  Id. ¶¶ 48, 52–53.  To safeguard its confidential information and intellectual property, on May 10, 2016, Abiomed Europe and Enmodes entered into a mutual non-disclosure agreement ("2016 MNDA").  Id. ¶ 54.  This agreement lasted five years and restricted each party's use of disclosed confidential information.  Id. ¶¶ 55–57.  When it expired, the parties entered into another mutual non-disclosure agreement on May 9, 2021 ("2021 MNDA").  Id. ¶ 57.

In 2017, Abiomed Europe and Enmodes entered into a Development & License Agreement ("2017 DLA") to "cooperate in the development of a product for heart failure patients requiring

[ECMO]" that incorporated both companies' technologies, including Abiomed's Impella technology.  Id. ¶ 58.  The 2017 DLA expressly incorporated the protections of the 2016 MNDA. Id. ¶ 59.  Abiomed was represented in negotiations by Siess, and Steve McEvoy (Abiomed USA's vice president and general counsel).   Id. ¶ 61.   Siess and McEvoy were based at Abiomed's headquarters in Danvers and communicated with Enmodes's representatives by email, telephone and video conference.  Id. ¶¶ 61, 74.  McEvoy sent emails and conducted telephone calls with Enmodes representatives, including Kaufmann, from Danvers, Massachusetts.  Id. ¶ 61.  In June 2019, the DLA was amended ("2019 Amended DLA"), following negotiations involving Siess, Mark Began (Abiomed USA's vice president, general counsel and secretary), Kaufmann, and Sascha Kuns (Enmodes Deputy CEO and CFO).  Id. ¶¶ 62-63.  Shortly before the amendment was executed, Kaufmann met with Siess and Began at Abiomed USA's headquarters in Danvers, Massachusetts.  Id. ¶ 64.

## B.    2020 Consulting Services Agreement

At some point in or prior to 2020, Abiomed needed assistance performing computer simulations in connection with various Impella heart pump projects.  Id. ¶¶ 65, 67.  Around the same time, Kaufmann expressed to Siess that Enmodes wanted to focus on "building its own products" instead of "providing services to others."  Id. ¶ 66.  Kaufmann represented that Enmodes would provide exclusive consulting services for Abiomed in exchange for the capital needed to build Enmodes's own products.  Id. ¶ 66.  In 2020, Abiomed Europe and Enmodes executed a consulting services agreement ("CSA"), "under which Enmodes was 'to provide product development work, including modelling and CAD work related to computational fluid mechanics pertaining to' Abiomed medical devices, such as the Impella ECP."   Id. ¶ 68.   The CSA incorporated the 2016 MNDA and contained a section restricting Enmodes's use of confidential information.  Id. ¶ 69.  The CSA further disclaimed Enmodes's rights in Abiomed's existing

intellectual property and in any discoveries arising out of Abiomed's confidential information or Enmodes's work under the CSA.  Id. ¶ 70.  Finally, the CSA prohibited Enmodes from "perform[ing] services relating to catheter-based blood pumps or any competitors of Client" during the term of the CSA or for two years thereafter.  Id. ¶ 71.  In return for Enmodes's services, Abiomed agreed to purchase at least two million euros worth of services annually from Enmodes and at least ten million euros worth of services over the full four-year term of the CSA.  Id. ¶ 73.

Pursuant to the CSA, Abiomed USA entered into a Statement of Work ("SOW") with Enmodes for services relating to six technical areas including the design of the Impella ECP and an ECMO project.  Id. ¶ 72; D. 21-2 at 10.  Under the SOW, Enmodes was guaranteed a €400,000 up-front payment and a €600,000 quarterly fee which "superseded" the amount promised under the CSA.  D. 17-1 ¶ 77; D. 21-2 at 2, 11.

Abiomed's representatives in the CSA and SOW negotiations were Began, Siess and Wolf Mueller-Hillebrand (Abiomed USA's senior corporate counsel).  D. 17-1 ¶ 74.  All three were "based at Abiomed, Inc.'s corporate headquarters in Danvers, Massachusetts, from where they conducted the negotiations by email, telephone and videoconferences with Enmodes's representatives."  Id.  During negotiations, "Abiomed made clear that it did not want Enmodes to work with other companies on catheter-based blood pumps" and Enmodes represented that it did not intend to do so.  Id. ¶¶ 75, 76.  In particular, Kaufmann stated in a May 13, 2020 email to Began that Enmodes had no "intention to provide service for another catheter-based pump company."  Id. ¶ 75; D. 21-6 at 20.

### C.    Abiomed Discloses Confidential Information to Enmodes

In connection with the CSA and SOW, Abiomed shared its confidential and trade secret information with Enmodes with the expectation that Enmodes would keep such information confidential.  D. 17-1 ¶ 83.  For one example, on November 26, 2020, Abiomed and Enmodes

employees attended a virtual kick-off meeting for work under the CSA and SOW. <u>Id.</u> ¶ 96. At the meeting, an Abiomed employee disclosed information relating to Abiomed's development of a tangential rotor design for its heart pumps. <u>Id.</u> ¶ 96. On December 1, 2020, Abiomed provided digital design ("CAD") models of the Impella ECP and other Abiomed devices and components to Enmodes through a data exchange platform. <u>Id.</u> ¶ 84. The files were stored on Abiomed's servers in the United States and downloaded by Enmodes from Germany. <u>Id.</u> ¶ 85; D. 53-1 ¶¶ 5– 6. Abiomed also disclosed information to Enmodes regarding the design and shape of the cannula outlet openings in the Impella ECP. D. 17-1 ¶¶ 107–08, 111. Under the terms of the CSA and SOW, Abiomed commissioned Enmodes to optimize the pump housing liner for Impella ECP. <u>Id.</u> ¶¶ 100–02. Enmodes summarized its findings in a project report. <u>Id.</u> ¶ 103. Kaufmann also emailed reports to Abiomed USA's Vice President of Global Operations, Matt Plano, summarizing the status of various projects, including those conducted under the CSA. <u>Id.</u> ¶ 119.

Enmodes's work on the Impella ECP project was "subject to review" by D'Ambrosio in Massachusetts. <u>Id.</u> ¶ 117. Enmodes employees communicated with Abiomed employees in Danvers, Massachusetts. <u>Id.</u> ¶ 118. For instance, Enmodes R&D project manager attended weekly team meetings and communicated extensively with Emilia Jahangir with Abiomed's Danvers-based platform lead on a separate project. <u>Id.</u> Kaufmann also emailed reports to Abiomed USA's Vice President of Global Operations, Matt Plano, summarizing the status of various projects, including those conducted under the CSA. <u>Id.</u> ¶ 119.

### D.    <u>Kaufmann Creates and Assists Abiomed's Competitors</u>

Unknown to Abiomed, during negotiations of the 2017 DLA, Kaufmann and a fellow Enmodes co-founder created a new company. <u>Id.</u> ¶ 122. The company was Suzhou Xinqing Medical Technology Co., Ltd. ("MagAssist"), a Chinese company. <u>Id.</u> ¶ 121-22. Kaufmann is an "active participant in MagAssist." <u>Id.</u> ¶ 123. Kaufmann did not disclose his relationship to

MagAssist in negotiations of the 2017 DLA or the CSA or SOW.  Id. ¶¶ 123, 126–27.  MagAssist is a heart pump manufacturer and markets itself as a direct competitor to "innovative American stock market giant ABIOMED."  Id. ¶ 124.  Abiomed alleges that "as early as July 2020," Kaufmann and Enmodes were providing services to MagAssist to design and optimize its products, contrary to Kaufmann's May 13, 2020 representation that he had no intention to provide services to Abiomed's competitors.  Id. ¶¶ 125, 127.  Abiomed also alleges that Enmodes and Kaufmann disclosed Abiomed's confidential information to MagAssist so that MagAssist could develop competing medical devices and file Chinese patent applications on those products.  Id. ¶ 121.

In addition, Abiomed alleges that "[b]efore Abiomed and Enmodes began negotiating the CSA and SOW, Kaufmann had already entered into yet another Chinese venture, Lungshield Holding Ltd. (HK)" ("Lungshield").  Id. ¶ 80.  Lungshield is a Hong Kong-based company working on "a next-generation compressible heart pump" that is "virtually identical to the Impella ECP."  Id. ¶¶ 80, 136.  As of January 20, 2020, Lungshield was the sole shareholder of Enmodes, and Enmodes was the sole shareholder of Lungshield.  Id. ¶¶ 81, 135.  Kaufmann is currently the Managing Director of Lungshield.  Id. ¶ 135.  Kaufmann and Enmodes never disclosed their relationship with Lungshield to Abiomed.  Id. ¶¶ 82, 135.

In May 2022, Kaufmann informed Siess that Chinese investors were "pressuring him to develop heart pumps similar to Abiomed's Impella for the Chinese market" and "he was having difficulty resisting this opportunity."  Id. ¶ 131.  Siess "urg[ed] Kaufmann not to agree."  Id. ¶ 132. Kaufmann told Siess "he supposedly 'could not refuse' the Chinese investors' requests."  Id. ¶¶ 133.  Abiomed then terminated its collaboration with Enmodes.  Id. ¶ 134; D. 44-2 at 104–113.

E.    **Proceedings in Germany**

On July 1, 2022, Abiomed Europe initiated two civil proceedings against Enmodes and Kaufmann in the German Regional Court of Cologne by filing a single pleading (the "German

Civil Complaint"). D. 21-24 ¶¶ 5–6.  In the German Civil Complaint, Abiomed Europe asserts that Enmodes and Kaufmann revealed trade secrets relating to Impella ECP, which were disclosed to Enmodes pursuant to a 2020 consulting services agreement.  Id. ¶¶ 7–10; D. 21-9.  Abiomed Europe claimed that it was the owner of the trade secrets including the "(1) the design of the [Impella ECP] rotor; (2) the design of the pump housing; and (3) the design of the outflow hose."  D. 21-24 ¶ 10.  Abiomed USA is not a party to the German Civil Complaint.  Id. ¶ 14.  The German Civil Complaint sought a preliminary injunctions and seizure of Enmodes's records to preserve evidence for later infringement proceedings.  Id. ¶ 12; D. 26-1 ¶¶ 7–9.  Enmodes's records have been seized and are under review by experts appointed by the Regional Court of Cologne.  D. 21-24 ¶ 18–20.  The final expert report is expected to be available later this year.  Id. ¶ 23.

Abiomed Europe has also filed a criminal complaint against Kaufmann with the Public Prosecutor's Office in Aachen, Germany ("German Criminal Complaint").  D. 21-24 ¶ 4; D. 26-1 ¶ 10; D. 26-7.  The German Criminal Complaint recounts Kaufmann's alleged misappropriation of Abiomed Europe's trade secrets obtained under a 2020 consulting services agreement and recommended that law enforcement investigate whether Kaufmann committed any criminal trade secret offenses.  D. 26-7.

## IV.    Procedural History

Abiomed initiated this lawsuit in Essex Superior Court on October 17, 2022.  D. 2-1; D. 17-1.  Enmodes removed the matter to this Court and has now moved to dismiss the complaint.  D. 2; D. 20.  Abiomed has moved for limited discovery relating to the Court's personal jurisdiction.  D. 27.  The Court heard the parties on the pending motions and took the matters under advisement.  D. 56, 58.

## V.    Discussion

Defendants seek dismissal for both lack of personal jurisdiction and *forum non conveniens*.

D. 20 at 1.  Because "the doctrine of *forum non conveniens* can never apply if there is absence of

jurisdiction," Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (1947) (emphasis added), this Court

begins by addressing personal jurisdiction.  See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,

549 U.S. 422, 436 (2007) (explaining jurisdictional issues should be disposed of first "[i]n the

mine run of cases," where "jurisdiction will involve no arduous inquiry" (internal quotation marks

and citation omitted)).

### A.    **Personal Jurisdiction**

To exercise jurisdiction over the non-resident Defendants, this Court must "find sufficient

contacts between the defendant and the forum to satisfy both that state's long-arm statute and the

Fourteenth Amendment's Due Process clause."  Sawtelle, 70 F.3d at 1387 (citations omitted).

Abiomed does not argue that general jurisdiction applies here, see D. 26-5 at 11–12, so the Court

focuses its analysis on the Massachusetts long-arm statute, Mass. Gen. L. c. 223A, and the three-

prong due process inquiry for specific jurisdiction, see Astro–Med, Inc. v. Nihon Kohden Am.,

Inc., 591 F.3d 1, 9 (1st Cir. 2009) (citations omitted).

### 1.    *Massachusetts Long-Arm Statute*

The Massachusetts long-arm statute provides this Court jurisdiction over any defendant

who, *inter alia*, (a) "transact[s] any business in [Massachusetts]"; (b) contract[s] to supply services

or things in [Massachusetts]"; or (d) "caus[es] tortious injury in [Massachusetts] by an act or

omission outside [Massachusetts] if he regularly does or solicits business, or engages in any other

persistent course of conduct, or derives substantial revenue from goods used or consumed or

services rendered, in [Massachusetts]" as to a claim "arising from" those acts.  Mass. Gen. L. c.

223A § 3.  Pursuant to the long-arm statute's "arising from" requirement, "a claim arises from a

defendant's transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State." Tatro v. Manor Care, Inc., 416 Mass. 763, 771 (1994) (citing cases). "The inquiry ultimately boils down to a 'but for' causation test which asks [d]id the defendant's contacts with the Commonwealth constitute the first step in a train of events that result[ed] in the personal injury." Access Now, Inc. v. Otter Prods., LLC, 280 F. Supp. 3d 287, 291 (D. Mass. 2017) (alteration in original) (citation and internal quotation marks omitted).

a)      Transacting Business, § 3(a)

Abiomed asserts that Defendants' transaction of business within Massachusetts is sufficient to satisfy Mass. Gen. L.  c. 223A § 3(a). "For jurisdiction to exist under § 3(a), the facts must satisfy two requirements—the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." Exxon Mobil Corp. v. Att'y Gen., 479 Mass. 312, 317 (2018) (citation and internal quotation marks omitted). The "transacting business" clause "is construed broadly, and courts look to whether the defendant attempted to participate in the Commonwealth's economic life." Geis v. Nestle Waters N. Am., Inc., 321 F. Supp. 3d 230, 238 (D. Mass. 2018). The test "is designed to identify deliberate, as distinguished from fortuitous, contacts with the forum by the nonresident party . . . with a view to determining whether the possible need to invoke the benefits and protections of the forum's laws was reasonably foreseeable." Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 112–13 (1st Cir. 1997) (internal citation and quotation marks omitted). In a typical contract case, the defendant's contacts with the forum must be "instrumental" to the formation of the contract. eIQnetworks, Inc. v. BHI Advanced Internet Sols., Inc., 726 F. Supp. 2d 26, 31 (D. Mass. 2010).

Here, the allegations of the complaint and supporting documentation permit the inference that Kaufmann and Enmodes engaged with Abiomed, including Abiomed USA, to obtain confidential and trade secret information relating to heart pumps.  Prior to entering the CSA and SOW, Kaufmann and Enmodes had become involved with at least two companies that allegedly are competing against Abiomed using technology that was disclosed to Enmodes under those agreements.  D. 17-1 ¶¶ 80, 123–125, 135.  Kaufmann then approached Siess with a proposal that Enmodes provides exclusive consulting services to Abiomed, even as Enmodes was supporting MagAssist, one of those competitors, with the development of potentially competing products based on similar technology.  Id. ¶ 66; see id. ¶ 125 (alleging that Enmodes and Kaufmann were "offering engineering and technical services to MagAssist . . . as early as July 2020").  By that time, Kaufmann was on notice that Abiomed Europe was not operating independently of Abiomed USA in Massachusetts, given, for one example, his visit to the Danvers headquarters prior to entering a previous contract.  See id. ¶ 64; D. 21-23 ¶ 10; D. 26-6 ¶ 13; The Scuderi Grp., LLC v. LGD Tech., LLC, 575 F. Supp. 2d 312, 319 (D. Mass. 2008) (concluding that defendants transacted business in Massachusetts where they "reached out multiple times to Plaintiff in Massachusetts to establish a business relationship").  During negotiations for the CSA and SOW, Enmodes and Kaufmann communicated frequently with individuals based in Danvers, Massachusetts, including Siess, Began and Mueller-Hillebrand.  D. 17-1 ¶ 74; D. 21-6 at 14–21; D. 26-6 ¶¶ 12–15 (averring that Kaufmann negotiated contracts between Abiomed USA and Enmodes with Began).  To the extent Kaufmann avers that many of his communications were in Germany, D. 21-23 ¶ 11 (attesting that many of his negotiations were "face-to-face in Aachen, Germany" and were in German), the email correspondence submitted alongside the parties' briefs reveal that Kaufmann negotiated key unique terms of the CSA in English with Began and Mueller-

Hillebrand (based in Massachusetts, D. 17-1 ¶ 74), including the non-disclosure agreements at issue in the present litigation.  D. 21-6 at 14–21; see eIQnetworks, Inc., 726 F. Supp. 2d at 32–33 (concluding § 3(a) was satisfied where defendant was "an active participant" when "negotiat[ing] unique terms in its contract with [Massachusetts] plaintiff" by email and fax (collecting cases)).

Although Defendants characterize Began and Mueller-Hillebrand as merely Abiomed Europe's "counsel in the U.S. regarding amendment to the agreements negotiated between the German companies in Germany," D. 21-25 at 10, Began and Mueller-Hillebrand were identified as representatives of Abiomed USA in the email correspondence between the parties.  D. 21-6 at 14, 17, 21.  Began's email signature identifies him as a vice president and general counsel of Abiomed USA and lists his United States phone numbers.  Id. at 14, 21.  Mueller-Hillebrand's signature identifies him as Abiomed USA's senior corporate counsel and also lists his business address in Danvers, Massachusetts.  Id. at 17.

Moreover this case is distinguishable from Collision Communications, a case cited by Defendants.[2]  See D. 21-25 at 10 (quoting Collision Commc'ns, Inc. v. Nokia Sols. & Networks Oy, 485 F. Supp. 3d 282, 295 (D. Mass. 2020)).  In Collision Communications, a New Hampshire corporate plaintiff did not establish this Court's personal jurisdiction over a contractual counterparty based on that the defendant's email and phone communications with a remote employee of plaintiff who lived in Massachusetts.  Collision Commc'ns, 485 F. Supp. 3d at 291–92.  The plaintiff's principal place of business was New Hampshire, the defendant otherwise

---

[2] The Court notes that Defendants also cite other cases for the proposition that the contact with plaintiff's chosen counsel should not suffice to establish personal jurisdiction in the forum where plaintiff's counsel is located.  D. 21-25 at 10 (quoting Young v. Cap. One Bank, No. 07-60731-CIV, 2007 WL 1952979, at *4 (S.D. Fla. July 2, 2007)); D. 40-1 at 5 (collecting cases).  These cases involve an analysis of whether defendants purposefully availed themselves of the forum, not jurisdiction under a state long-arm statute so the Court addresses this line of cases in its due process analysis.

communicated with plaintiff's representatives in New Hampshire and the parties had never met in Massachusetts.  Id. at 291.  By contrast, here, Massachusetts was the site of Abiomed USA's corporate headquarters and Began, Mueller-Hillebrand and Siess were "based at" that location.  D. 17-1 ¶¶ 64, 74; D. 26-6 ¶¶ 12–15.  Kaufmann had also previously visited Began and Siess at Abiomed USA's headquarters shortly before execution of the 2019 Amended DLA to "solicit business from" Abiomed USA.  D. 17-1 ¶ 64; D. 21-23 ¶ 10; D. 26-6 ¶ 13.

Defendants nevertheless urge that the Court discount Kaufmann's contacts with Massachusetts because Defendants expressly rejected Abiomed USA as a contractual counterparty to the CSA.  D. 21-25 at 8–10.  Kaufmann avers that during negotiations, he revised the July 13, 2020 draft of the CSA to reflect that the appropriate counterparty was Abiomed Europe, rather than Abiomed USA.  D. 21-23 ¶ 15.  Further, Kaufmann avers that he would also have changed the SOW party from Abiomed USA to Abiomed Europe if he "had noticed this inconsistency prior to execution."  Id. ¶ 16.  Finally, Kaufmann avers that he "did not appreciate" that Enmodes's work "pursuant to the CSA and SOW exposed [him] to a risk of litigation in the United States."  Id. ¶ 17.  The Court must nevertheless evaluate whether "the possible need to invoke the benefits and protections of the forum's laws was reasonably foreseeable," not whether Kaufmann subjectively appreciated the risk at the time.  Lyle Richards Int'l, 132 F.3d at 112–13.  Kaufmann did not communicate any objection to venue in Massachusetts simply by changing the counterparty from Abiomed USA to Abiomed Europe.  The Scuderi Grp., 575 F. Supp. 2d at 316, 322–23 (concluding that personal jurisdiction was established even where defendant removed clause consenting to jurisdiction in Massachusetts during contract negotiations).

Even if the Court were to assume that that Kaufmann's visit to Abiomed USA's headquarters in Danvers was related only to the 2019 Amended DLA, Kaufmann was reasonably

on notice before he began negotiating the CSA and SOW that Abiomed USA was interested in the outcome of the collaboration between Abiomed Europe and Enmodes, and that any further collaboration between Abiomed Europe and Enmodes was contingent on Abiomed USA's approval.  The record here establishes that Kaufmann's negotiations with Began and Mueller-Hillebrand were instrumental to formation of the CSA, even if Abiomed USA was not a party to that agreement.  See Workgroup Tech. Corp. v. MGM Grand Hotel, 246 F. Supp. 2d 102, 109–10 (D. Mass. 2003) (concluding that the "at least four telephone calls, five emails, and three faxes sent by [defendant] to [plaintiff] in Massachusetts over a three month period that culminated in the consummation of the contract between the two parties" satisfied § 3(a)).

   b)  <u>Contracting to Supply Services or Things, § 3(b)</u>

   Abiomed also asserts that Defendants contracted to supply services in Massachusetts under Mass. Gen. L. c. 223A § 3(b).  D. 26-5 at 17–18.  § 3(b) requires Massachusetts to be "the place where the services or things are to be supplied rather than . . . the place of the contracting." Droukas v. Divers Training Academy, Inc., 375 Mass. 149, 157 (1978); see Island Oasis Frozen Cocktail Co. v. Fla. Bulk Sales, Inc., No. CIV.A 03-1696, 2004 WL 557300, at *1 (Mass. Super. Mar. 10, 2004) (concluding § 3(b) was not satisfied where Florida corporation entered contract with Massachusetts plaintiff to ship coconut cream from Philippines to Florida, Illinois and Oregon).

   Here, Enmodes entered the SOW with Abiomed USA, under which Defendants agreed to provide various "services" to Abiomed USA in Massachusetts.  D. 21-2 at 10–11.  These services include "Documentation," D. 53-2 at 9 (quoting D. 21-2 at 10), which Kaufmann emailed to Plano in the form of various reports in July 2021, D. 44-1.  The provision of the results of Enmodes work and the delivery of the reports themselves to a Massachusetts company satisfies § 3(b).  In re TelexFree Sec. Litig., 626 F. Supp. 3d 253, 281 (D. Mass. 2022) (holding that consultant

contracted to supply services in Massachusetts where he was hired by Massachusetts company to provide advice).

Defendants object that the July 2021 emails to Plano were emailed as a courtesy rather than pursuant to any contractual obligation. D. 44 at 6; D. 40-1 ¶ 5 (averring that "Enmodes previously provided [the reports] to German contacts at Abiomed Europe"). The SOW identifies Abiomed USA as the "Client" hiring Enmodes for various services. D. 21-2 at 10. Enmodes may have originally sent the reports to Abiomed Europe, but it prepared such reports pursuant to a contract with Abiomed USA and after a history of negotiation with Abiomed USA's representatives in Massachusetts. Defendants should have known that the reports were for use by Abiomed USA, regardless of whether the SOW provided that documentation be delivered to Plano. In re TelexFree, 626 F. Supp. 3d at 280–81 (concluding that consultant "in effect delivered [its] advice to Massachusetts, for use in Massachusetts" even though none of its employees ever worked in Massachusetts).

Accordingly, the Court concludes that § 3(b) of the long-arm statute also allows for jurisdiction over Defendants.[3] Given that the Massachusetts long-arm statute permits jurisdiction over Defendants, the Court next considers whether such jurisdiction comports with due process.

     *2. Due Process*

The constitutional guarantee of due process "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471–72 (1985) (citation and internal quotation marks omitted). Where the plaintiff asserts that the Court may

---

[3] Having determined that jurisdiction is proper under §§ 3(a) or (b), the Court need not reach Abiomed's alternative argument regarding § 3(d).

exercise specific jurisdiction over the defendant, the Court's inquiry is threefold:  relatedness, purposeful availment and reasonableness.  Astro–Med, 591 F.3d at 9 (citations omitted).  The Court must find that all three are present to assert personal jurisdiction over a defendant.

      a)      Relatedness

To determine relatedness, the Court considers whether "the claim underlying the litigation . . . directly arise[s] out of, or relate[s] to, the defendant's forum-state activities."  Id. (alternations in original) (citations omitted).  It is a "flexible, relaxed standard."  Id. (citation omitted).  However "the defendant's in-state conduct must form an 'important, or [at least] material, element of proof' in the plaintiff's case."  Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005) (alternation in original) (quoting United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992)).  For a breach of contract claim, the Court must "ask whether the defendant's activity in the forum state was instrumental either in the formation of the contract or its breach," Vapotherm, Inc. v. Santiago, 38 F.4th 252, 258–59 (1st Cir. 2022) (citation and internal quotation marks omitted), and "focus on the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealings."  C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 66 (1st Cir. 2014) (internal citations and quotation marks omitted).  For trade secrets claims, relatedness may be satisfied where defendant's contacts with the forum gave rise to the confidential relationship between the parties.  Wilcox Indus. Corp. v. Hansen, No. 11-CV-551-PB, 2012 WL 1246146, at *5 (D.N.H. Apr. 13, 2012) (concluding that contacts with forum "neither attenuated nor indirect" where defendant attended meetings in forum state at which he was entrusted with plaintiff's trade secrets); Adhesive Techs., Inc. v. Isaberg Rapid AB, No. 10-CV-75-SM, 2011 WL 2134381, at *7 (D.N.H. May 26, 2011) (concluding that emails "instrumental in the formation of the written Agreement, which includes a confidentiality clause . . . are sufficiently related to

16

plaintiff's trade secret claim").  Finally for tort claims, such as fraudulent inducement claim here, the defendant's contacts must be both the "cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)" of the plaintiff's injury.  Mass. Sch. of L., 142 F.3d at 35.

As explained above, Defendants' contacts with Massachusetts include communications directed to Began, Mueller-Hillebrand and Siess in Danvers, and a visit to Abiomed USA's Danvers headquarters, which were instrumental in the formation of the CSA and SOW between Enmodes, Abiomed Europe and Abiomed USA, which Abiomed now alleges was breached.  D. 21-6; D. 21-23 ¶¶ 12–14; D. 26-6 ¶¶ 12–15; see eIQnetworks, 726 F. Supp. 2d at 34 (concluding that telephone, email and fax communications to negotiate contract in dispute "fulfill the relatedness inquiry").  The CSA and SOW established Enmodes's duty of confidentiality for any "technical, scientific, legal, strategic or other information received by it directly or indirectly from [Abiomed Europe]."  D. 21-10 at 5; see, e.g., D. 17-1 ¶¶ 55, 59–60, 69–71.  Thus, Defendants' contacts with Massachusetts "form an important element of [Abiomed's] proof" for the trade secret misappropriation claims, Adhesive Techs., 2011 WL 2134381, at *7, namely, that the trade secrets were "acquired under circumstances giving rise to a duty to limit [their] acquisition, disclosure, or use."  Mass. Gen. L. c. 93 § 42(2)(ii)(B)(II); see 18 U.S.C. § 1839(5); The Scuderi Grp., 575 F. Supp. 2d at 322 (concluding that nexus existed between in-forum contacts and plaintiff's claims where defendant's acts in Massachusetts "were instrumental in the formation of the confidential business relationship and the execution of the [nondisclosure agreement], both of which are at the center of Plaintiff's claims"); Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp., 394 F. Supp. 2d 299, 309 (D. Mass. 2005) (concluding that personal jurisdiction was established in breach of contract and trade secret misappropriation case where defendant's long-term contacts with

Massachusetts gave rise to negotiations for purchase agreement and execution of confidentiality agreement). Further, Kaufmann's May 13, 2020 email to Began containing the alleged misrepresentation of Enmodes's intent to avoid competing with Abiomed forms the basis of Abiomed's fraudulent inducement claim and satisfies the relatedness requirement. Slade Gorton & Co. v. HSBC Bank Canada, No. 13-CV-12290-DJC, 2014 WL 4772264, at *8 (D. Mass. Sept. 23, 2014) (concluding that relatedness was satisfied for fraud and fraudulent inducement claims where defendant's misrepresentations were directed to in-forum plaintiff). For all of these reasons, relatedness is established for each of Abiomed's claims.

b)   Purposeful Availment

A defendant must also "purposefully avail[] itself of the privilege of conducting activities within the forum State." Hanson v. Denckla, 357 U.S. 235, 253 (1958). The defendant's contacts must be voluntary rather than "based on the unilateral actions of another party," Adelson v. Hananel, 510 F.3d 43, 50 (1st Cir. 2007), as well as foreseeable, "such that he should reasonably anticipate being haled into court there." LaVallee, 193 F. Supp. 2d at 303. "In contract cases, we have found the exercise of jurisdiction is reasonably foreseeable when the defendant deliberately direct[ed] its efforts toward the forum state . . . or when the defendant enter[ed] a contractual relation that envisioned continuing and wide-reaching contacts in the forum state." LP Sols. LLC v. Duchossois, 907 F.3d 95, 104 (1st Cir. 2018) (alterations in original) (internal quotation marks and cites omitted).

Here, the Court concludes that Abiomed has shown that Enmodes and Kaufmann purposefully availed themselves of Massachusetts. Defendants pursued an ongoing business relationship with not only Abiomed Europe over the course of several years, but also its parent company in Massachusetts. The history of conduct between Enmodes and Abiomed shows that Kaufmann, on behalf of Enmodes, reached out to Abiomed USA's representatives over a course

of several years and had visited Abiomed USA's headquarters in Danvers in 2019.  D. 17-1 ¶¶ 53–78 (alleging that Kaufmann approached Siess regarding a partnership and that the parties entered various contracts relating to Abiomed's confidential information).  Enmodes entered the SOW with Abiomed USA, making Abiomed USA a party to the work Enmodes performed on the Impella ECP project.  Id. ¶ 72.  The complaint further alleges facts from which the Court can reasonably infer that Kaufmann targeted Abiomed Europe and Abiomed USA, because he had founded other companies with the intent to compete in the same field.  Id. ¶¶ 80–82, 121–27, 135–36; see id. ¶ 124.

Defendants characterize their contacts with Massachusetts as caused by Abiomed Europe's unilateral decision to involve counsel located in Massachusetts.  D. 44 at 4–5.  In support of this argument, Defendants cite two cases involving defendants who passively mail documents to plaintiff's chosen counsel in an unrelated forum.  See, e.g., Cole v. Cole, No. 3-12-0153, 2012 WL 1825700, at *4 (M.D. Tenn. May 18, 2012) (concluding that participants in plaintiff's Florida divorce and child custody proceedings did not purposefully avail themselves of Tennessee by faxing a report to plaintiff's counsel in Tennessee); Medina v. Lorenzo, No. CV 04-171 WJ/DJS, 2004 WL 7337882, at *2, 6 (D.N.M. June 16, 2004) (holding that 401K administrator and other defendants did not avail themselves of New Mexico by mailing denial letters to plaintiff's counsel).  By contrast to the facts in those cases, Kaufmann and Enmodes cultivated a relationship with Abiomed for their own financial benefit, not merely to maintain their preexisting obligation to communicate with Abiomed.  See Workgroup Tech. Corp., 246 F. Supp. 2d at 114 (holding that defendant purposefully derived economic benefit from forum where defendant exchanged extensive communication with in-forum plaintiff regarding various contracts and solicited business from plaintiff while physically present in forum).  That is, correspondence with

Abiomed's in-house counsel was not merely fortuitous because Defendants knew they were negotiating the CSA and SOW with Abiomed's representatives based at Abiomed USA's headquarters. Cf. Collision Commc'ns, 485 F. Supp. 3d at 295 (dismissing for lack of purposeful availment where defendant corresponded with plaintiff's employee in Massachusetts, but plaintiff's home state was New Hampshire); Motor Components, LLC v. Devon Energy Corp., 338 S.W.3d 198, 201, 205–06 (Tex. App. 2011) (holding plaintiff, a Delaware company with principal place of business in Oklahoma, could not establish Texas's jurisdiction over defendant based on defendant's attorney's communications with plaintiff's in-house counsel located in Texas).

The record contains sufficient facts to establish that Kaufmann and Enmodes understood the target of their conduct to be not only Abiomed Europe in Germany, but also Abiomed USA in Massachusetts. By entering the CSA and SOW, Defendants agreed to a multiyear contractual obligation which implicated the interests of Abiomed USA, in addition to Abiomed Europe. For instance, the confidentiality clause of the CSA does not limit itself to confidential information or trade secrets owned by Abiomed Europe, but to any information "received by [Enmodes] directly or indirectly" from Abiomed Europe. D. 21-2 at 4. Even if Abiomed USA was not the contractual counterparty to the CSA, Kaufmann corresponded with Began and Mueller-Hillebrand over key contractual terms and visited to Abiomed USA's headquarters as part of his alleged scheme to acquire valuable trade secrets. Defendants could thus reasonably foresee that the alleged trade secret misappropriation would injure Abiomed USA and lead to litigation in this in Massachusetts. Adhesive Techs., 2011 WL 2134381, at *9 (concluding that defendant purposefully availed itself of Massachusetts where it "obtained the information allegedly misappropriated, and put itself in a position that (allegedly) facilitated its improper breach and conversion" through its voluntary

forum contact); eIQnetworks, Inc., 726 F. Supp. 2d at 35 (holding that purposeful availment was established where defendant knew that plaintiff was Massachusetts company based on emails and "actively negotiated" contract terms with plaintiff).

c)     <u>Reasonableness</u>

To establish this Court's specific jurisdiction over Enmodes and Kaufmann, Abiomed must also show that the exercise of jurisdiction is reasonable in light of the five Gestalt factors: "(1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." <u>A Corp. v. All American Plumbing, Inc.</u>, 812 F.3d 54, 61 (1st Cir. 2016) (alteration in original) (citation omitted).  These factors "play a larger role in close cases." <u>Id.</u>; <u>see</u> <u>Sawtelle</u>, 70 F.3d at 1394 (citation omitted) (recognizing that reasonableness factors "come into play only if the first two segments of the test for specific jurisdiction have been fulfilled").

Here, Defendants assert that "the international dimensions of this case create 'unique burdens' for Defendants" including "the burden of conducting an entire course of litigation at substantial distance from their normal forum despite the fact that the transaction underlying the claims took place entirely in Germany."  D. 21-25 at 12 (citing <u>Asahi Metal Indus. Co. v. Superior Court of Cal.</u>, 480 U.S. 102, 114–15 (1987)).  As an initial matter, the Court disagrees with Defendants that all events underlying the claims took place in Germany, given the Massachusetts contacts recounted above.  Moreover, Defendants have not established any "special or unusual burden" beyond the usual burden of engaging in business travel between Germany and Massachusetts.  <u>Griffiths v. Aviva London Assignment Corp.</u>, 187 F. Supp. 3d 342, 349 (D. Mass. 2016) (concluding that travel between London and Boston was not special or unusual burden).

21

Indeed, Kaufmann has previously traveled to Massachusetts in furtherance of Enmodes's relationship with Abiomed. D. 17-1 ¶ 64. This factor does not weigh in Defendants' favor.

As to the second factor, Massachusetts has a legitimate interest in adjudicating a dispute in which a Massachusetts company allegedly has been injured through disclosure of its trade secrets. See C & W Fabricators, Inc. v. Metal Trades, Inc., No. CIV.A. 01-40061-NMG, 2002 WL 32759591, at *7 (D. Mass. Mar. 27, 2002). This weighs in Abiomed's favor.

As to the third factor, the Court must accord Abiomed's choice of forum due deference. Id.

As to the fourth and fifth factors, the Court recognizes that the existence of concurrent litigation in Germany weighs against reasonableness in this case. See Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994) (explaining that judicial system's interest in obtaining effective resolution "counsels against furcation of the dispute among several different jurisdictions"). However, "[b]ecause a Massachusetts corporation has allegedly been damaged through a breach of contract to protect trade secrets and confidential and proprietary business information, Massachusetts has a significant interest in adjudicating the instant dispute." C & W Fabricators, Inc., 2002 WL 32759591, at *7.

Although recognizing that there are some parallel proceedings in Germany, on balance the Gestalt factors indicate that jurisdiction here is reasonable. Accordingly, the Court concludes that jurisdiction over Defendants comports with the Due Process Clause and consequently concludes that Abiomed has established personal jurisdiction. In light of this ruling, the Court denies Plaintiffs' motion for jurisdictional discovery, D. 27, as moot.

**B.    Forum Non Conveniens**

Defendants argue, in the alternative, that even if personal jurisdiction over them exists here, this case should be dismissed on grounds of *forum non conveniens*. D. 21-25 at 13. "*Forum non*

22

*conveniens* gives courts the discretion 'to dismiss a case because the chosen forum . . . is so inconvenient that it would be unfair to conduct the litigation in that place.'" Curtis v. Galakatos, 19 F.4th 41, 46 (1st Cir. 2021) (quoting Nandjou v. Marriott Int'l, Inc., 985 F.3d 135, 140 (1st Cir. 2021)).  Because a plaintiff is entitled to a "heavy presumption" in favor of its chosen forum, defendants seeking dismissal on grounds of *forum non conveniens* bear a "heavy burden."  Id. at 47 (citations omitted).  The defendant must "show[] both that an adequate alternative forum exists and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum."  Imamura v. Gen. Elec. Co., 957 F.3d 98, 106 (1st Cir. 2020) (citation omitted).

### 1.    *Adequacy of Alternative Forum*

"[A]n adequate alternative forum exists when "(1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court."  Id.  An alternative forum in one that "addresses the types of claims that the plaintiff has brought" and in which "the defendant is amenable to service of process."  Id.

Here, the Court concludes that the Regional Court of Cologne in Germany is an adequate forum.  Although the presently ongoing proceedings in Germany are focused on the preservation of evidence and an initial determination of the likelihood of trade secret misappropriation, there is no indication that Abiomed USA could not join in any future infringement proceeding in Germany. See D. 21-24 ¶ 12; D. 26-1 ¶¶ 7–9; D. 40-1 at 28.  The German Court has already established its jurisdiction over Defendants, who have not apparently resisted service of process.  See D. 21-9 at 64; D. 21-24 ¶¶ 17–18, 27. The CSA provides that disputes arising from its terms should be governed by German law.  D. 21-2 at 8.  The uncontroverted declaration of Enmodes's German counsel, Dr. Hans-Claudius Scheef, indicates that the claims brought by Abiomed in the present

action have corollaries in German law and adequate remedies for addressing Abiomed's injuries. D. 21-24 ¶¶ 30–37; Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254–55 (1981) (concluding that Scottish forum was adequate even though plaintiffs could not rely on strict liability theory and potential damages award was smaller).  Accordingly, the Court concludes that Germany is an available and adequate alternative forum for this dispute.

        *2.*    *Considerations of Convenience and Judicial Efficiency*

To determine whether the interests of convenience and judicial efficiency strongly favor litigation in the alternative forum, the Court must balance several public and private interest factors.  Nandjou, 985 F.3d at 141.   The relevant private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [and the] possibility of view of premises, if view would be appropriate to the action."  Curtis, 19 F.4th at 48 (alteration in original) (quoting Iragorri v. Int'l Elevator, Inc., 203 F.3d 8, 12 (1st Cir. 2000)).  The relevant public interests include, "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty."  Id. (quoting Piper, 454 U.S. at 241 n.6).  To meet its burden, defendant must show the factors favor the alternative forum "to such a degree that it suffices to overcome the presumption that the plaintiff is entitled to bring her case in her home forum."  Nandjou, 985 F.3d at 142.  Thus, dismissal is not warranted if the relative burdens of litigating in the two forums are "in equipoise" or "marginally favor" the alternative forum.  Id. at 141.

a)      Private Factors

As to the private factors, Defendants characterize Germany as "where the researchers who developed the technology reside" and contend that the key witnesses and sources of proof will be more easily accessed in Germany.  D. 21-25 at 15–16.  The witnesses may also include employees of Abiomed Europe (and its wholly-owned subsidiary ECP Entwicklungsgesellschaft mbH), though neither party has submitted evidence of where these employees, other than Siess, reside. D. 21-24 ¶ 16.  Defendants further argue that discovery into the December 2020 transfer of Abiomed's CAD models to Enmodes would be best done in Germany, because as the download link was emailed in German from an employee of Abiomed Europe.  D. 21-25 at 15 (citing D. 21-22).  While these sources of proof may be conveniently obtained and evaluated in Germany, they do not negate other sources of proof that would be more available in Massachusetts.  The record does not appear to show that all researchers who developed the relevant technology resided in Germany.  D. 17-1 ¶¶ 25, 43 (alleging that "[m]ost Abiomed projects are developed in the United States" though employees in Europe may assist and that "platform lead for Impella ECP is located in Massachusetts, along with a team of engineers").   Other key witnesses for Abiomed are employed in Massachusetts, including witnesses who can testify as to Abiomed's reliance on statements made during those negotiations of the CSA and SOW—such as Began and Mueller-Hillebrand—and as to damages suffered by Abiomed USA.  Id. ¶¶ 159–161; D. 21-6; D. 26-6 ¶¶ 12–14.  Defendants also concede that most German witnesses also speak English, D. 21-25 at 16, see D. 21-23 ¶ 3, and neither side has suggested that witnesses will be unwilling to testify despite the burdens of travel.  Compare Curtis, 19 F.4th at 53 (reversing dismissal under *forum non conveniens* where defendant "made no allegations that any of the witnesses would be unwilling to testify in the United States absent compulsory process" and had not provided sufficient evidence as to residency of third-party witnesses in Greece), with Iragorri, 203 F.3d at

15 (affirming dismissal under *forum non conveniens* where two key witnesses of accident in Colombia were Spanish speakers who could not be "compelled to attend a trial in Maine").  To the extent that either party presents third-party witnesses from China regarding Enmodes's relationship with MagAssist or Lungshield, Germany and Massachusetts would be equally inconvenient forums and there is no suggestion that German courts would be more able to compel an unwilling Chinese witness than this Court.  Translation of key evidence would likely need to occur as key terms of the CSA were negotiated in English as well as in German.  See Curtis, 19 F.4th at 57 (concluding that need for translation did not strongly favor litigation in Greek court where translation would be required in Greek litigation for English-speaking witnesses).  Thus dismissal is not strongly favored by German courts' access to sources of proof.

Kaufmann avers that litigation in the U.S. would require him to take time away from his familial obligations to his wife and two young children as well as his professional obligations.  D. 21-23 ¶ 22.  While these obligations are important, they do not weigh heavily against litigation in Massachusetts in the *forum non conveniens* analysis, particularly where modern means may reduce the need to travel during the pre-trial phases of litigation here.  Linkco, Inc. v. Nichimen Corp., 164 F. Supp. 2d 203, 214–15 (D. Mass. 2001) (recognizing burden of transporting witnesses and documents from Japan to the United States, but explaining that "[d]iscovery inconvenience can be minimized by videoconferencing").  Defendants also argue that the financial burden of foreign litigation on Kaufmann as an individual weighs in favor of dismissal.  D. 21-25 at 16.  Although Kaufmann is a named defendant, the present suit is connected to his role as the CEO of Enmodes.  The record suggests that Enmodes derived substantial revenue from its collaboration with Abiomed Europe.  Defendants have made no specific showing that the financial burden on Kaufmann, or Defendants collectively, would make litigation in the United States unfair.

Finally, Defendants argue litigation in Massachusetts will be a waste of judicial and litigant resources because Plaintiffs will need to submit any judgment in this case to the German courts, which "will only enforce the action to the limit of what would be available under German law." D. 21-25 at 17.  Defendants have not explained why a judgment of this Court would exceed the remedy available under German law.  Indeed, elsewhere the Defendants emphasize the robust remedies German law provides for Plaintiffs' claims in this action.  D. 21-25 at 14.  Defendants cannot meet their heavy burden by conjuring the mere possibility that a future judgment will be unenforceable.   Cf. Linkco, 164 F. Supp. 2d at 214–15 (dismissing defendant for whom final judgment of Japanese court had already issued and had preclusive effect, but not defendant who provided "no basis" for why judgment could not be enforced).

b)  Public Interest Factors

As to the public interest factors, Defendants argue that the application of German law to this dispute would be more competently and efficiently undertaken by a German court.  D. 21-25 at 18 (arguing that parties would need to provide affidavits and translations of German authorities). Plaintiffs do not dispute that German law governs interpretation of the CSA and SOW according to the CSA's choice of law clause, D. 21-2 at 8, but argue that no efficiency would be gained if the case were left to German courts, because those courts would still need to apply Massachusetts common law and Massachusetts and federal trade secret law.  D. 26-5 at 25; see Linkco, 164 F. Supp. 2d at 213 (concluding that familiarity with Massachusetts law favored litigation in this Court where Japanese court accustomed to civil law system "cited no Massachusetts trade secret cases and engaged in written analysis of Massachusetts law").

Certainly both the federal Defend Trade Secrets Act ("DTSA") and Massachusetts Uniform Trade Secrets Act ("MUTSA") provide causes of action for claims based on extraterritorial conduct.   18 U.S.C. § 1837(2) (providing that DTSA applies "to conduct occurring outside the

27

United States if . . . an act in furtherance of the offense was committed in the United States");
Taylor v. E. Connection Operating, Inc., 465 Mass. 191, 198 (2013) (explaining that in the absence
of "explicit limitation on a statute's geographic reach, there is no presumption against its
extraterritorial application in appropriate circumstances").   The Court notes also that under
Massachusetts choice-of-law rules, German law may apply to the trade secret and other tort claims.
Cosme v. Whitin Mach. Works, Inc., 417 Mass. 643, 647 (1994).  Still, even assuming that foreign
law applies to some or all of the claims, the Court is cognizant that it should not give undue weight
to the need to apply foreign law, particularly as other factors weigh against adjudication in
Germany.  See Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 720 (1st Cir. 1996) (giving little weight
to need to apply Hong Kong law, particularly since "the task of deciding foreign law [is] a chore
federal courts must often perform") (citation and internal quotation marks omitted).

Defendants further argue that "Massachusetts citizens have little to no interest serving as
jurors in a case involving a contract executed in Germany, with German choice of law, over
technology developed by German researchers employed by German entities, where the key players
are German, and where the relevant events took place in Germany."  D. 21-25 at 19.  Even if
Germany has an interest in this dispute, Massachusetts does as well.  The Court does not conclude
that Massachusetts is an "unrelated" forum.  Defendants' argument to the contrary ignores that the
alleged breach and misappropriation caused harm to a Massachusetts company and arose out of
contracts negotiated by representatives working from Abiomed USA's Massachusetts location.  In
such circumstances, the burden of jury duty does not favor either party.   Jofran Sales, Inc. v.
Watkins & Shepard Trucking, Inc., 216 F. Supp. 3d 206, 214 (D. Mass. 2016) (concluding that
"factors related to having localized controversies decided at home, ease of access for interested

members of the public, and the burden of jury duty do not weigh in favor of either party because the parties are each at home in the competing jurisdictions").

Finally, Defendants assert that "German courts are efficient," D. 21 at 18, and submit that the Regional Court of Cologne "has a special competence for procedures that deal with the disclosure of trade secrets" and will likely produce an expert report assessing the likelihood of a trade secret violation by the end of this year.  D. 21-24 ¶¶ 21–23, 25.  Defendants do not, however, "provide[] the Court with information about the relative congestion of the competing dockets" which would allow the Court to make a "comparative determination of where the case can be most quickly resolved." Jofran Sales, 216 F. Supp. 3d at 214 (quoting Mercier v. Sheraton Int'l, Inc., 935 F.2d 419, 428 (1st Cir. 1991)).  At most, Defendants' German counsel asserts that German proceedings move "more quickly than the courts of European neighbors."  D. 21-24 ¶ 22. Moreover, the anticipated date at which the expert report is made available does not appear to reflect when the controversy between Abiomed Europe and Enmodes will be resolved, as Abiomed Europe may initiate infringement proceedings after the report is finalized.  D. 40-1 at 28.

c)   Deference to Plaintiffs' Choice of Forum

Defendants also argue that the Court can consider the existence of concurrent litigation in Germany in its *forum non conveniens* analysis, either as a reason to discount deference to Plaintiffs' choice of forum or as placing an unfair burden on Defendant.  D. 21-25 at 19–21; D. 40-1 at 9.  However, "[t]he existence of concurrent litigation is not a relevant factor to the analysis." Adelson, 510 F.3d at 54.  Defendants attempt to distinguish the present case from Adelson on the basis that the defendant in Adelson filed as a plaintiff in Massachusetts while defending a foreign lawsuit.  D. 44 at 9.  This Court has not, however, found this distinction persuasive in light of the clear language in Adelson. See Neelon v. Krueger, 63 F. Supp. 3d 165, 171–72 (D. Mass. 2014) (relying on Adelson, applying presumption in favor of plaintiff's home

29

forum even where he had previously initiated litigation in Canada and California and noting that "[s]erial litigation that is no longer proceeding must necessarily have no greater relevance to the determination of a forum's convenience than concurrent litigation occurring at the same time as the case in question").  Concurrent litigation is only "relevant to demonstrate the availability of an alternative adequate forum" (which this Court has already found to exist here) and "is not properly considered when balancing the factors of convenience."  Jofran Sales, 216 F. Supp. 3d at 214.

d)    <u>Balancing the Interests</u>

Given the deference this Court must give to Plaintiff's choice of forum and the weight of the public and private interest factors discussed above, the Court concludes that convenience and judicial efficiency do not counsel strongly against litigation in Massachusetts.  Accordingly, the motion to dismiss the complaint under the doctrine of *forum non conveniens* is also denied.

## VI.   Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss, D. 20, and DENIES Plaintiffs' motion for jurisdictional discovery, D. 27, as moot.

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge